**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 94-30474

PETER J. KELLY,

                                        Plaintiff-Appellant,

                    versus

BOEING PETROLEUM SERVICES,
INC.,

                                        Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Louisiana

(August 7, 1995)

Before REAVLEY, KING and WIENER, Circuit Judges.

WIENER, Circuit Judge:

This is an appeal from the district court's judgment, following a jury verdict adverse to Plaintiff-Appellant Peter J. Kelly, dismissing his suit against his former employer, Defendant-Appellee Boeing Petroleum Services, Inc. (BPS). Kelly's suit was for damages and injunctive relief under the Louisiana Civil Rights Act for Handicapped Persons (the Act).[1] On appeal, Kelly complains that the district court erred reversibly in (1) excluding evidence of other discriminatory acts and utterances by Kelly's immediate supervisor, Frank Lemoine, and (2) instructing the jury that a

---

[1]  La. Rev. Stat. §§ 46:2251, et seq.

plaintiff, like Kelly, who seeks to recover under the Act on a reasonable accommodation claim has the burden of proving by a preponderance of the evidence that the employer <u>intentionally</u> discriminated on the basis of a handicap when it failed to accommodate the handicapped employee. Concluding that the trial court did not commit reversible error in either instance, we affirm.

I

FACTS AND PROCEEDINGS

BPS provided contract management services to the United States government for a number of Strategic Petroleum Reserve sites in Louisiana. Kelly was employed by BPS as Maintenance Manager at one of the sites (the St. James site) from 1985 until July 1992. The "physical aspects" of Kelly's employment at the St. James site, which included inspection of facilities and equipment, could involve "climbing, bending, walking, and squatting on an average of three times a week." Except for Lemoine who, as Site Manager for the company, was Kelly's immediate superior, Kelly was the highest-ranking BPS official whose principal work assignment was the St. James site. Permeating the situation at the St. James site was the overarching animosity that had developed between Lemoine and Kelly; to say that they did not get along would be an understatement. There was "constant wrangling" between the two, which began in 1985 and escalated thereafter until, in 1990 or 1991, the relationshipSQ in Kelly's own wordsSQgot "out of control" and came to the attention of Lemoine's supervisor.

In July 1992, BPS transferred Kelly to another site (the New Orleans site) to serve as Maintenance Analyst there.  He worked for BPS at the New Orleans site until April 1993, when BPS lost its management contract to another company for which Kelly continued to work without interruption.

Early in January 1993, while he was still employed by BPS, Kelly filed suit in state court against BPS alleging a reasonable accommodation claim and a discrimination claim under the Act.  BPS subsequently removed the suit to the district court on the basis of diversity of citizenship.  The principal thrust of the suit was BPS's response to Kelly's requests for reasonable accommodations for his back condition.  Kelly's initial reasonable accommodation claim implicated the failure of BPS to (1) furnish him an ergonomic (orthopedic) chair, (2) reduce the number and frequency of the physically-demanding inspections that he was required to make at the St. James site, and (3) assign him a parking space specially-designated for the handicapped (designated parking space) at the New Orleans site after his transfer there.  Kelly's discrimination claim alleged that BPS violated the Act by transferring him from the St. James site to the New Orleans site, which resulted in a longer commute and a perceived demotion in stature (but not in compensation) in retaliation for his requests for reasonable accommodation.

Kelly first injured his back lifting weights in 1979, while serving in the United States Marine Corps.  He re-injured his back late in 1986 while playing softball for the St. James site's team

and was hospitalized in connection with that injury. Based on Kelly's claim that he experienced constant pain while performing his employment duties following the 1986 aggravation of his 1979 back injury, the Veterans Administration awarded Kelly a 10% disability rating for his lumbar spine condition, for which he receives monthly compensation.

In September 1991, Kelly filed a complaint with the United States Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), asserting that he was the victim of discrimination on the bases of his race (Caucasian), sex (male), handicap, veteran's status, and disabled veteran's status. He also complained of harassment by his supervisor, Lemoine.

The following February Kelly's lawyer wrote to Jerry Siemers, President of BPS, seeking accommodations for Kelly's handicap. The letter requested that BPS retain Kelly's designated parking space, furnish Kelly with a physician-approved chair providing upper and lower back support, and reduce the number and frequency of inspections that Kelly was required to make as Maintenance Manager of the St. James site. The letter noted that Kelly's "significant low back and neck pain" made it difficult for him to perform the physical tasks involved in the site inspections. In addition to seeking physical accommodations, the letter requested that Siemers stop Lemoine from making "unjustified, unsupported, and petty criticisms and reprisals" against Kelly.

Subsequently, the OFCCP completed its investigation and, on April 20, 1992, informed Kelly of the results. The agency found

Kelly to be "an individual with a handicap within the meaning of Section 503 of the [federal] Rehabilitation Act of 1973," but the OFCCP determined that BPS "was not aware that [Kelly] was disabled to the extent that he could not perform his duties . . . perceive[] [Kelly] as handicapped." The OFCCP also determined that Kelly had not been harassed or retaliated against and had not sustained any loss of wages.

One day after the date of OFCCP's letter to Kelly, BPS acted in response to the February letter from Kelly's lawyer seeking accommodation. BPS provided Kelly with a letter describing his job-related physical tasks and requested that an examining physician, Dr. Robert Hanchey, give his professional opinion whether Kelly's condition at the time required him to have an orthopedic chair to perform his duties. The letter did not ask Dr. Hanchey about Kelly's need for a designated parking space or the need to limit Kelly's required site inspections. In response, Dr. Hanchey advised that an ergonomic chair was not a medical necessity, so BPS did not supply one; neither did Kelly acquire one on his own in mitigation of damages.

BPS made no adjustments to Kelly's inspection schedule or job duties but did continue to provide him with a designated parking space at the St. James site. No such parking space was provided when BPS transferred Kelly to the New Orleans site. In October 1993, Dr. Hanchey stated in deposition testimony that Kelly had not been handicapped at the time BPS inquired about Kelly's need for an ergonomic chair. The physician testified that:

> With what I had to work with, . . . I d[id]n't
> think that [Kelly] [wa]s handicapped to the
> point that he be designated that way . . . .
> I d[id]n't find him impaired to the degree
> that he [could not] do his job or impaired to
> the degree that he would be handicapped . . .
> I d[id]n't see his current situation requiring
> that description.

Although Dr. Hanchey stated that he could not remember if he had authorized a handicap license plate for Kelly, he said that "[i]f I did, shame on me." Dr. Hanchey's opinion was that Kelly had a 10% permanent partial/whole body impairment of his lumbar area and a 5% neck impairment.

Regarding basic life functions, Kelly conceded that his back injury does not substantially prevent him from caring for himself, performing manual tasks, seeing, hearing, speaking, breathing, or learning. He confirmed that he can go shopping, prepare dinner for himself, and "sometimes" walk around the block; but he stated that he cannot perform certain types of yard work or errands, play sports, drive for long periods of time without experiencing pain, or participate with his children in their sports activities. Kelly testified that he could not walk for more than 300-400 feet at a time, that he had trouble lifting objects over five pounds, reaching, climbing, bending and stooping, and that "[t]he limitations in my ability to climb have caused severe pain, especially considering the number and frequency of on-site inspections which I was ordered to do by Mr. Frank Lemoine" while employed by BPS at the St. James site.

In addition to Dr. Hanchey, Kelly's physician, a general practitioner, testified in his deposition that he "turned [Kelly's]

6

case over to Dr. Hanchey for definitive care" and deferred to Dr. Hanchey's opinion regarding the percentage of Kelly's disability and whether Kelly needed a special chair. A physical therapist also examined Kelly during that period. Despite Kelly's many physical examinations, however, it was not until September 1993, well after he and BPS parted company, that Kelly was diagnosed by a neurologist as having multiple sclerosis. The neurologist determined that at that time Kelly needed an orthopedic chair and was entitled to a special license plate for the handicapped. Clearly, however, no one at BPS and none of the health care professionals who had examined Kelly earlier knew of his multiple sclerosis when BPS made its decisions (1) not to accommodate Kelly with the ergonomic chair, (2) not to diminish his inspection duties, (3) to transfer him to the New Orleans site, and (4) not to give him a designated parking space at the New Orleans site.

In fact, when Kelly was transferred from the St. James site to the New Orleans site, at the same rate of pay, the sole purposeSQaccording to SiemersSQwas to eliminate the "constant wrangling between site management [Lemoine]" and Kelly; the transfer had nothing to do with Kelly's physical condition. Even though the request for Kelly's relocation was initiated by Lemoine, in whose opinion Kelly was "irresponsible, insubordinate and blatantly defiant of policy, procedure and[/]or authority," the transfer decision was not made by Lemoine but by his superiors, with input from at least three other BPS officials who agreed that relocating Kelly was the best solution to the friction at the St.

7

James site.

Kelly alleged in his suit against BPS that he qualified as a handicapped person under La. Rev. Stat. § 46:2251, that BPS failed to make reasonable accommodations for his handicap, and that his transfer to the New Orleans site constituted discrimination on the basis of handicap, as it was instigated by Lemoine because Kelly was unable to perform the physical requirements of his inspection duties. Without denying his personal conflict with Lemoine, Kelly nevertheless took the position at trial that his department ran well and that he could cooperate with Lemoine regardless of their differences. The record reflects that Kelly received merit pay increases in all years preceding 1992, and another in January of 1993, but none in 1992.

BPS countered that (1) it had no knowledge of Kelly's handicap, (2) Kelly did not fall within the definition of a "handicapped person" under the state statute, thereby pretermitting the need to make accommodation, (3) BPS had nonetheless made efforts to accommodate Kelly's alleged handicap, (4) Kelly's transfer to the New Orleans facility resulted solely from his inability to get along with Lemoine, (5) Lemoine did not make the decision to transfer Kelly to New Orleans, and (6) the BPS officials who did make the transfer decision did so without knowledge or consideration of Kelly's alleged inability to perform the physical requirements of his position as Maintenance Manager of the St. James site.

After the district court granted a partial summary judgment in

favor of BPS,[2] the claims that remained to be tried to the jury fell into either of two categories: (1) reasonable accommodation or (2) handicap discrimination. Kelly's remaining reasonable accommodation claim under the Act included the contention that BPS failed to accommodate his disability by (1) not modifying his work schedule while he was Maintenance Manager at the St. James site, and (2) not providing a designated parking space for him at the New Orleans site. Kelly's handicap discrimination claim under the Act included the contention that BPS retaliated against him for requesting reasonable accommodations when it transferred him to the New Orleans site and denied his 1992 merit pay raise.

At the conclusion of a three-day trial, the jury found that Kelly was an "otherwise qualified handicapped employee" within the meaning of the Act, but that he failed to prove by a preponderance of the evidence that "intentional handicap discrimination" was a motivating factor in any employment decision by BPS vis-a-vis Kelly. The district court entered judgment based on the jury's verdict, dismissing Kelly's claims. Kelly timely appealed, assigning the two points of reversible error noted above, i.e., the court's refusal to allow testimonial evidence regarding Lemoine's allegedly discriminatory remarks to and actions towards other BPS employees, and the court's instruction to the jury that Kelly was required to prove "[t]hat intentional handicap discrimination was a motivating factor in [BPS's] adverse employment decisions."

---

[2] The court dismissed Kelly's claims concerning the ergonomic chair and a designated parking place at the St. James site, and Kelly has not re-asserted those claims on appeal.

ANALYSIS

A.   Evidentiary Rulings

1.   Standard of Review

We review the evidentiary rulings of the district court under the deferential abuse-of-discretion standard.[3]  When, as here, the district court has conducted, on the record, a carefully detailed analysis of the evidentiary issues and the court's own ruling, appellate courts are chary about finding an abuse of discretion.  Here, the district court provided alternative bases for its rulingsSQrelevance and unfair prejudiceSQwhich we shall examine in turn to see whether the court's position is supportable under either or both alternatives.

2.   The Evidence Excluded

Kelly proposed to adduce testimony concerning Lemoine's insensitive actions and unsympathetic attitudes towards other employees who were members of several disadvantaged minority groups, including persons with medical, health and handicap problems, and Lemoine's "Bunker-esque" remarks, jokes and disparaging statements about these persons and groups.  The district court, in response to BPS's pre-trial Motion in Limine, ruled inadmissible testimony regarding Lemoine's acts and statements that implicated matters other than handicap or

---

[3] _United States v. West_, 22 F.3d 586, 591 (5th Cir.), _cert. denied_, 115 S. Ct. 584 (1994); _accord_ _United States v. Newman_, 982 F.2d 665, 668 (1st Cir. 1992), _cert. denied_, 114 S. Ct. 59 (1993).

disability discrimination.  The court did so based on its findings

that:

> (1) such evidence of other acts of discrimination not
> directed at plaintiff and unrelated to the type of
> discrimination at issue (i.e., disability discrimination)
> is irrelevant; (2) even assuming some marginal relevance,
> such evidence has the substantial potential to confuse
> and mislead the jury and is calculated to arouse jury
> sympathy of the <u>unfairly</u> prejudicial genre causing the
> jury to attempt to punish BPS for other acts of Mr.
> Lemoine for which neither he nor BPS is not [sic] on
> trial; and (3) the mini-trial which would necessarily
> follow evidence of each and every such `other act' would
> amount to needless waste of judicial resources and would
> add nothing to the plaintiff's case, since the issue here
> is whether <u>plaintiff</u> was the target of "<u>disability</u>
> discrimination" and there is no suggestion that
> plaintiff['s] claims of injury are rooted in either
> gender, racial or any type of discrimination other than
> disability/handicap discrimination."    (emphasis in
> original).

In response to that part of Kelly's reply to the Motion in

Limine in which he identified several individuals who would

purportedly testify about Lemoine's acts and comments indicative of

handicap discrimination or bias, however, the court agreed to "hear

such witness' (sic) testimony <u>in</u> <u>camera</u> prior to their taking the

witness stand to determine what portion, if any, of their

testimony, this Court will permit at trial."  The court thus denied

BPS's Motion in Limine to the extent it sought to exclude testimony

regarding other instances in which Lemoine's acts or utterances

would directly demonstrate handicap or disability discrimination on

his part.

The evidence excluded following the <u>in</u> <u>camera</u> hearing

comprised testimony that Lemoine (1) disparaged one employee

because he wore a hearing aid; (2) treated another employee in a

11

"less friendly" and more businesslike manner when he returned to work following heart surgery; (3) treated another insensitively regarding her health concerns; and (4) was generally "insensitive and unsympathetic to the medical needs" of BPS employees.

Kelly advocated the admissibility of testimony regarding Lemoine's handicap-related discriminatory remarks towards other BPS employees as circumstantial evidence of intentional discrimination, but the courtSQafter conducting its _in_ _camera_ reviewSQdetermined that this testimony, like that excluded _in_ _limine_, was irrelevant to the particular claims proffered by Kelly and that any probative value would be outweighed by its potential for unfair prejudice, confusion and delay. In addition, the court expressed the opinion that to allow such testimony would open the door to a series of separate "mini-trials" on each anecdotal incident, implying that such would further delay the proceedings and confuse the jury.

Kelly nevertheless insists on appeal that in excluding such testimony the district court abused its discretion by keeping from the jury evidence of Lemoine's "mind-set and biases towards those in his employ who were handicapped or infirm." As Kelly makes a facially plausible case both for the relevance of the testimony proffered in connection with his discrimination claim and for the probative value of that evidence not being outweighed by unfair prejudice, we proceed to scrutinize closely the evidence proffered _in_ _camera_ and the district court's alternative reasons for excluding such evidence.

3. Relevance

Kelly does not dispute that, to prevail on his discrimination claim under the Act, he had to show that BPS intentionally discriminated against him. In support of the district court's exclusion of the subject testimony, BPS argues that Kelly's proffered proof of Lemoine's alleged conduct regarding other employees is not relevant because it does not sufficiently resemble the treatment of which Kelly complained: job transfer and denial of pay raise resulting from handicap discrimination.

We have previously observed that "[t]he standard for relevance is a liberal one."[4] "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[5]

Any comments that Lemoine might have directed at Kelly regarding his particular disability would be clearly relevant and thus admissible, for that would tend to show discriminatory animus.[6] Less direct evidence of discriminatory intentSQtestimony of anecdotal instances of Lemoine's conduct towards other BPS employees is a different matter and one that we must consider. We therefore turn to an examination of the testimony excluded in the court's ruling on the Motion in Limine and the testimony excluded

---

[4] EEOC v. Manville Sales Corp., 27 F.3d 1089, 1093 (5th Cir. 1994), cert. denied, 115 S. Ct. 1252 (1995).

[5] Fed. R. Evid. 401.

[6] See id. at 1094-95 (district court abused discretion in age discrimination suit by excluding testimony that supervisor referred to plaintiff as "old man" and described him as "old and inflexible.")

13

after the court's in camera examination to decide whether the court abused its discretion in determining relevance.

a.   Evidence of Acts Other Than Handicap or Disability Discrimination

The court in its ruling on BPS's Motion in Limine prohibited Kelly from presenting testimony about Lemoine's alleged discriminatory or bigoted acts or statements regarding race, sex and other categories besides handicap or disability.  We agree with other circuits that have cautioned that an appellate court should carefully examine blanket pre-trial evidentiary rulings.[7]  In this instance, our thorough consideration of the district court's pre-trial evidentiary ruling leads us to the conclusion that it was correct.

We do not believe that testimony about Lemoine's random acts and remarks concerning matters unrelated to handicaps or disabilities has any tendency to prove that Lemoine discriminated against Kelly on the basis of his handicap.  In Rauh v. Coyne[8], the district court excluded evidence of racial animus in a case alleging discrimination based on sex and marital status because the court found that there existed only a "weak correlation" between

_____

[7]   See Estes, 856 F.2d at 1103 (deeming significant that "the court's determinations of probative value and prejudice were made before trial began, rather than during the development of the plaintiff's case before the jury."); Riordan v. Kempiners, 831 F.2d 690, 697 (7th Cir. 1987) (finding careful review necessary because judge's discretion was exercised "on a wholesale basis before trial began, rather than in response to developing course of trial").

[8]744 F.Supp. 1181 (D.D.C. 1990).

14

sex and race discrimination.[9]  Similarly, we find a tenuous relationship here between discrimination that could be reflected in Lemoine's derogatory remarks about race, sex, and national origin and discrimination based on <u>handicap</u>, which is the focus of Kelly's complaint.

We therefore agree with the district court that Lemoine's acts of unrelated discrimination are irrelevant, particularly given that Lemoine was not one of the BPS executives who made or participated in the ultimate determinations (1) to transfer Kelly to the New Orleans site and deny him a designated parking space there, (2) to withhold Kelly's 1992 merit raise, and (3) to refuse to reduce the number and frequency of Kelly's inspections at the St. James site. Unlike cases in which the proffered evidence related to the same kind of discrimination and in which bigoted superiors directly made or participated in the employment decisions complained of, the court's ruling regarding anecdotal incidents of unrelated kinds of prejudice cannot be labeled an abuse of discretion when considered within the framework of this case.

b.   <u>Evidence of Handicap or Disability Discrimination</u>

When a plaintiff must prove intentional discrimination, a district court can abuse its discretion by limiting a plaintiff's ability "to show the `atmosphere' in which the plaintiff[] `operated.'"[10]  In seeking to demonstrate that the district court

---

[9]<u>Id.</u> at 1183.

[10]  <u>Ratliff v. Governor's Highway Safety Program</u>, 791 F.2d 394, 402 (5th Cir. 1986).  Although courts have held that "background evidence" of race or sex discrimination should be admitted in cases

here thus abused its discretion, Kelly turns for support to a body of jurisprudence typified by the Eighth Circuit's opinion in Estes v. Dick Smith Ford, Inc.[11]

The Estes court held that a trial court abused its discretion by excluding evidence that tended to show a climate of race and age bias in a suit alleging discrimination on those grounds. Specifically, the Estes trial court had refused to admit evidence that the employer (1) excluded blacks from its work force, (2) fired two other employees because of their ages, (3) offered free rides to white customers, but not to black customers, and (4) referred pejoratively to blacks.[12]  The Eighth Circuit found, inter alia, that evidence of the employer's prior acts of race discrimination against customers was relevant to allegations of race discrimination against one employee, as the same persons were responsible for the same types of discrimination.  The Estes court noted:

> It defies common sense to say, as [the employer] implies, that evidence of an employer's discriminatory treatment of black customers might not have some bearing on the question of the same employer's motive in discharging a black employee.[13]

The Estes court also found that the district court abused its

---

in which plaintiff must prove intentional discrimination, we are aware of no case addressing admissibility of similar evidence in a handicap discrimination suit; we do not perceive, however, a meaningful distinction between these types of discrimination cases.

[11]  856 F.2d 1097 (8th Cir. 1988).

[12]  See id. at 1102.

[13]  Id. at 1104.

16

discretion in excluding evidence that one of the employees who participated in the decision to fire the plaintiff told racist jokes.[14] Although the court noted that isolated racist comments do not themselves constitute a violation of Title VII, it reasoned that such evidence is probative whether an employee was discharged because of discriminatory animus.[15]

In another Eighth Circuit case, Hawkins v. Hennepin Technical Center,[16] involving unlawful retaliation following an employee's complaints of allegedly discriminatory employment practices based on sex, the court invoked Estes to hold that the trial court abused its discretion in excluding evidence of litigation between the employer's former students and the employer over alleged acts of sexual harassment.[17] The Hawkins court reasoned that "an atmosphere of condoned sexual harassment in a workplace increases the likelihood of retaliation for complaints [of sexual harassment] in individual cases."[18] The court additionally expressed the opinion that "[b]ecause an employer's past discriminatory policy and practice may well illustrate that the employer's asserted reasons for disparate treatment are a pretext for intentional discrimination, this evidence should normally be freely admitted at

---

[14] Estes, 856 F.2d at 1104.

[15] See id.

[16] 900 F.2d 153 (8th Cir.), cert. denied, 498 U.S. 854 (1990).

[17] See id. at 155-56.

[18] Id. at 156.

17

trial."[19]

Casting its lot with the Estes/Hawkins line of jurisprudence, the Third Circuit recently held in Glass v. Philadelphia Electric Co.[20] that a district court abused its discretion by repeatedly barring a plaintiff, during the course of the trial, from introducing evidence of a racially hostile work environment in a suit alleging race and age discrimination. Citing Hawkins with approval, the Glass court stated that such evidence "should have been admitted to help Glass meet his burden of proving intentional discrimination" and that it was highly probable that the evidentiary rulings affected the outcome of the case.[21] Given the similarity of the instant case to Estes, Hawkins, and Glass, we proceed to determine whether the reasoning in those casesSQthat a background of discrimination is probative of an instance of that same type of discrimination--applies equally to the handicap-related testimony proffered by Kelly here.

Kelly urges that the logic of Estes and Hawkins applies here because Lemoine's allegedly discriminatory acts regarding the disabilities of other BPS employeesSQfor example, his making fun of an employee's use of a hearing aid and his jokes about the disabledSQcould be probative of the question whether Lemoine had an invidious, discriminatory motive in recommending that Kelly, a handicapped employee, be transferred to the New Orleans site. Both

---

[19]  Id. at 155-56.

[20]  34 F.3d 188 (3d Cir. 1994).

[21]  Id. at 195.

Estes and Hawkins can be distinguished from the instant case, however, because in both of those cases the trial courts had excluded the evidence in question before the trials commenced, making blanket exclusions in response to motions in limine. The Eighth Circuit found that aspect noteworthy in both cases and expressed the opinion that "`blanket evidentiary exclusions can be especially damaging in employment discrimination cases, in which plaintiffs must face the difficult task of persuading the fact-finder to disbelieve an employer's account of its own motives.'"[22] Similarly in Glass, the court took note of the "judicial inhospitability to blanket evidentiary exclusions in discrimination cases."[23] Although the trial court in Glass had repeatedly excluded the same proffered testimony during the trial -- and not pre-trial as in Estes and Hawkins -- its repeated exclusions were made in a consistently blanket fashion from the beginning.

In contrast, the evidentiary rulings to which Kelly most vociferously objects on appeal were made individually during the trial, and not under a blanket exclusion. The district court's careful subjective consideration of the relevance of each proffered witness' testimony is a factor that we find significant in our analysis. Despite the distinguishing features of the Estes, Hawkins, and Glass cases, however, we too must examine the specific testimony proffered by Kelly to determine whether the trial court

---

[22] Hawkins v. Hennepin Technical Center, 900 F.2d 153, 155 (8th Cir.)(quoting Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1103 (8th Cir. 1988)), cert. denied, 498 U.S. 854 (1990).

[23] Glass, 34 F.3d at 195.

19

abused its discretion in finding the excluded evidence irrelevant to Kelly's claims.

In ruling on the admissibility of testimony by those remaining Kelly witnesses who purportedly would speak to Lemoine's acts or remarks implicating handicap or disability, the court conducted an _in camera_ examination during the course of the trial. Our close reading of the transcript of the court's questioning of some of these witnesses and of Kelly's counsel, out of the hearing of the jury, convinces us that the court's ruling cannot be tarred with the brush of abuse of discretion. When the court analyzed the true nature of the proffered testimony, relevance essentially evaporated. In fact, the most telling revelation of the _in camera_ proceeding may well have been the testimony of one of Kelly's proposed witnesses expressing his opinion that the reason Kelly and Lemoine "couldn't get along" was that each of them was a "strong manager" and simply had a "personality conflict." The proffered testimony reflected in the _in camera_ transcript revealed, at most, that Lemoine engaged in typical, blue-collar (as distinguished from executive suite) workplace kidding, well short of cruel disparagement or mockery. For example, as characterized by counsel for BPS at oral argument to this court, Lemoine's remarks about an employee's use of a hearing aid were made in the same vein as the self-deprecating remarks that the wearer of the hearing aid himself made on occasion.

In sum, we are satisfied that the court's relevance rulings, both _in limine_ and _in camera_, while admittedly close, did not rise

20

to the level of abuse of discretion.

4.  <u>Unfair Prejudice</u>

Even if we were to assume, <u>arguendo</u>, that the district court erred on its relevance call and did so to the point of abuse of discretion, we would still sustain the evidentiary rulings of the district court under its application of Fed. R. Evid. 403.

Rule 403 provides that:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.[24]

In ruling on BPS's Motion in Limine, the court conducted the required balancing test and determined that the probative value of the proffered evidence was "greatly outweighed by the danger of unfair prejudice, confusion of the issues, and the veritable certainty that the presentation of such evidence would mislead and inflame the jury." Again, our study of the transcript of the pertinent proceedings, which we conduct under the deferential abuse-of-discretion standard, constrains us to leave the ruling undisturbed.

We acknowledge that in discrimination cases

> [c]ircumstantial proof of discrimination typically includes unflattering testimony about the employer's history and work prac-ticesSQ evidence which in other kinds of cases may well unfairly prejudice the jury against the defendant. In discrimination cases, however, such background evidence may be

---

[24]  Fed. R. Evid. 403.

> critical for the jury's assessment of whether
> a given employer was more likely than not to
> have acted from an unlawful motive.[25]

Nevertheless, given (1) Lemoine's attenuation from the decision-making process affecting Kelly's employment conditions, (2) the dearth of evidence showing discriminatory animus or knowledge of the facts by those BPS executives who did participate directly in that decision-making process, and (3) the picture, painted by the overwhelming evidence, of a long-simmering and frequently-boiling personality conflict between these two strong managers, we are not prepared to say that the court abused its discretion in its alternative ruling under Fed. R. Evid. 403 that the evidence should be excluded as unfairly prejudicial.

5.   Substantial Rights

Erroneous evidentiary rulings by the trial court constitute reversible error only when those rulings have affected a party's substantial rights.[26]  An error does not affect substantial rights "if the court is sure, after reviewing the entire record, that the error did not influence the jury or had but a very slight effect on its verdict."[27]  We do not see that here the exclusion of the proffered testimony affected Kelly's substantial rights.  Having scoured the record we are satisfied that, even if we assume, arguendo, that the evidence was relevant and that its probative

---

[25]   Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1103 (8th Cir. 1988).

[26]   See Fed. R. Evid. 103.

[27]   EEOC v. Manville Sales Corp., 27 F.3d 1089, 1094 (5th Cir. 1994) (citations omitted), cert. denied, 115 S. Ct. 1252 (1995).

value was not substantially outweighed by its potential for unfair prejudice, Kelly's substantial rights were simply not affected. Even though under different circumstances, we have held that the exclusion of indirect evidence that is probative of discriminatory intent can taint a jury's verdict,[28] the facts noted in our discussion of relevance and unfair prejudice distinguish the instant case. For we can perceive of no influenceSQcertainly none greater than "very slight"SQthat the excluded testimony, if admitted, would have had on the jury's verdict; no effect, that is, other than "unfair prejudice," which neither we nor the district court can condone. In the face of the overwhelming evidence of Kelly's employment and back injury histories, the knowledge (or lack thereof) on the part of BPS officials superior to Lemoine, the bad chemistry between Kelly and Lemoine, and the opinions of physicians and the OFCCP, we remain convinced that the modicum of evidence rejected by the court could hardly have defeated BPS's plausible, non-discriminatory reasons for the employment decisions that Kelly points to as evidence of discrimination against him. We are therefore comfortable in the conclusion that the district court committed no reversible error in excluding Kelly's proffered evidence.

---

[28] See, e.g., id. at 1095; see also Estes, 856 F.2d at 1105 (exclusion of evidence was reversible error); Hawkins v. Hennepin Technical Center, 900 F.2d 153, 155 (8th Cir.) (reversible error), cert. denied, 498 U.S. 854 (1990); Glass v. Philadelphia Elec. Co., 34 F.3d 188, 195 (3d Cir. 1994) (reversible error); Riordan v. Kempiners, 831 F.2d 690, 697-99 (7th Cir. 1987) (reversible error).

B.    Jury Instruction

The second barrel fired by Kelly at the district court's conduct of the trial is his complaint that the district court erred in instructing the jury that Kelly was required to prove by a preponderance of the evidence "[t]hat intentional handicap discrimination was a motivating factor in [BPS's] adverse employment decisions."    Although Kelly concedes that this instruction correctly describes the standard of proof for his discrimination claim, he insists that the court erred by applying the same standard to his reasonable accommodation claim.    Kelly contends that to prevail on those claims he should not have been required to show "intentional" handicap discrimination, only that BPS failed or refused to accommodate his disability, regardless of intent.

Before turning to the substantive aspects of Kelly's second claim on appeal, however, we must determine the correct standard for our review.    Rule 51 of the Federal Rules of Civil Procedure requires that for an objection to a jury instruction to be preserved on appeal, a party must "object to it before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."[29]    Kelly failed to object to the jury instruction he now challenges; therefore, he did not preserve the issue for appeal.    Although Kelly submitted a proposed jury instruction and a verdict form that the district court subsequently rejected, we do not find that these proposals

_____

[29]   Fed. R. Civ. P. 51.

24

made Kelly's position sufficiently clear to the court to satisfy Rule 51's objection requirement.  As Kelly failed to object to the court's jury instruction, we review Kelly's contention on appeal under a "plain error" standard.[30]  In reviewing for plain error in this instance, we must determine whether "the deficient charge [wa]s likely responsible for an incorrect verdict which in itself creates a substantial injustice"[31] or resulted in a "`plain error' so fundamental as to result in a miscarriage of justice."[32]  We conclude from the analysis which follows that the instruction now challenged by Kelly did not produce plain error.

### 1.  Plain Language

Our starting point is with the plain language of the statute under which Kelly brought his suit, acknowledging that "[i]f language is plain and unambiguous, it must be given effect."[33]

In § 2254(C), the Louisiana legislature specified in detail the types of employer conduct for which an employee may seek redress under the Act.  In particular, § 2254(C)(1) addresses an employer's obligation to accommodate an employee's disability, stating that an employer shall not:

---

[30]  See Middleton v. Harris Press & Shear, Inc., 796 F.2d 747, 749 (5th Cir. 1986) ("where no timely objection is made to a jury instruction, the claimed error cannot be reviewed on appeal unless giving the instruction was `plain error' so fundamental as to result in a miscarriage of justice").

[31]  Roberts v. Wal-Mart Stores, Inc., 7 F.3d 1256, 1259 (5th Cir. 1993) (citations omitted).

[32]  Middleton, 796 F.2d at 749.

[33]  William N. Eskridge, Jr. & Philip P. Frickey, Legislation 707 (2d ed. 1995).

> [f]ail or refuse to hire, promote or reasonably accommodate an otherwise qualified individual on the basis of a handicap when it is unrelated to the individual's ability with reasonable accommodation to perform the duties of a particular job or position.[34]

When parsed as to reasonable accommodation, the plain language of this provision prohibits an employer from failing or refusing "to . . . reasonably accommodate" [1] an otherwise qualified individual [2] on the basis of a handicap [3] when [such handicap] is unrelated to the individual's ability [4] with reasonable accommodation [5] to perform the duties of a particular job or position."

We first look to see whether the phrase "on the basis of handicap" requires a plaintiff to show a nexus between the adverse employment decisionSQhere, refusal to accommodateSQand his disability.[35] Common parlance, rules of grammar, and rules of statutory interpretation all militate in favor of an interpretation requiring such nexus. Otherwise, the phrase would be mere surplusage. At a minimum, "on the basis of handicap" has to mean that to be actionable the employer's failure or refusal to accommodate must be <u>motivated</u> by the employee's handicap.

Finding that prerequisite does not, however, resolve the issue in the instant case, for Kelly insists that he was not required to prove "intentional" handicap discrimination, only the motivation.

---

[34] La. Rev. Stat. § 46:2254(C)(1).

[35] The remainder of the provision, "when [the handicap] is unrelated to the individual's ability with reasonable accommodation to perform the duties of a particular job or position," means that the employee's handicap must not render the employee incapable of performing his job, given a reasonable accommodation.

But regardless of whether Kelly refers to invidious, improperly-motivated conduct or simply volitional conduct when he objects to the "intentional" requirement, his concession that he is required to show "intentional handicap discrimination" to prevail on his discrimination claim leads inexorably to the conclusion that perforce he is also required to make the same showing to prevail on his reasonable accommodation claim. Why? Because the pertinent language of § 2254(C)(2), which governs Kelly's discrimination claim, is identical to the language of § 2254(C)(1) which governs his accommodation claim: Both subsections prohibit an employer from acting "on the basis of a handicap."[36] Thus we ask rhetorically: If, as Kelly concedes, the phrase "on the basis of a handicap" in § 254(C)(2) imposes on a plaintiff the burden of proving "intentional handicap discrimination," must we not interpret that phrase identicallySQand impose a congruent burden on a plaintiffSQwhen, in § 2254(C)(1), it is used identically in reference to reasonable accommodation? Clearly we must.

## 2. Purpose

We apply the plain language of a statute unless "literal

---

[36] Compare La. Rev. Stat. § 46:2254(C)(1) (An employer shall not "fail or refuse to hire, promote, or reasonably accommodate an otherwise qualified individual on the basis of a handicap when it is unrelated to the individual's ability with reasonable accommodation to perform the duties of a particular job or position.") with La. Rev. Stat. § 46:2254(C)(2) (An employer shall not "[d]ischarge or otherwise discriminate against an otherwise qualified individual with respect to compensation or the terms, conditions, or privileges of employment, on the basis of a handicap when it is unrelated to the individual's ability to perform the duties of a particular job or position.").

27

interpretation [would] . . . thwart manifest purpose."[37]  As we have just noted, the basic rules of statutory construction dictate that the plain language of § 2254(C)(1) should be interpreted to mean that a plaintiff must show "intentional handicap discrimination" to recover on an accommodation claim.  As we shall demonstrate, our literal reading of the plain language does not thwart the purpose of the legislation.

The stated purpose of the Act is:

> [t]o assure that every individual within the state is afforded an equal opportunity to enjoy a full and productive life and that the failure to provide such equal opportunity, whether because of discrimination, prejudice, or intolerance[,] not only threatens the rights and proper privileges of its inhabitants but menaces the institutions, the foundation of a free democratic state, and threatens the peace, order, health, safety, and general welfare of the state and its inhabitants.
> The opportunity to obtain employment, education, housing, and other real estate and full and equal utilization of public services and programs without discrimination on the basis of a handicap is a civil right.[38]

The pertinent language in the Act's stated purpose is capable of supporting a determination that the legislature intended to make handicap discrimination actionable only when it is produced by untoward motivation.  The Louisiana legislature specifically identified as one purpose of the statute the assurance that individuals would not be denied "equal opportunity . . . because of

---

[37]  Litigation, supra note 33, at 707.

[38]  La. Rev. Stat. § 46:2252 (emphasis added).

28

discrimination, prejudice, or intolerance"[39]SQthree words used here not as separate evils but as synonyms for the same abomination. Had the legislature meant to include deprivation of opportunity because of mere <u>indifference</u> or <u>inattention</u> to disability, it could have done so with ease; yet it did not.  True, the legislature included only "discrimination" and omitted "prejudice" and "intolerance" in the second paragraph of the Act's stated purpose in which entitlement to be free of discrimination on the basis of a handicap is defined as a "civil right."  But the fact that the legislature chose to use "prejudice" and "intolerance" synonymously with "discrimination" in the first paragraph of § 2252 to emphasize and identify the evil proscribed therein does not justify reading meaning into the omission of those synonyms from the second paragraph of § 2252.  We do not discern from the omission some cryptic and unnecessarily subtle legislative intent to include benign as well as invidious handicap discrimination when defining the civil right of, <u>inter</u> <u>alia</u>, the opportunity to obtain employment, while condemning only invidious handicap discrimination that denies one's opportunity to enjoy a full and productive life. Rather, we perceive such omission as nothing more sinister than avoidance of unnecessary repetition, something to be applauded in statutory drafting.  Thus we find nothing in the Act's stated purpose that supports the existence of a cause of action in

---

[39]  Standing alone, the word "discrimination" does not necessarily connote invidious motives, but here it heads the list which includes "prejudice and intolerance," apparently indicating the legislature's intent to proscribe only "bad" discrimination.

handicap-based employment discrimination when such discrimination results benignly from negligence, indifference or inattention. As such, our reading of the plain language of the statute does not thwart the manifest purpose of the legislation.

   3.   Federal Law

      Both Kelly and BPS discuss the Act in light of the federal Rehabilitation Act of 1973[40] and cases that construe that statute. We proceed with caution before relying on such federal sources, however, given several obvious differences between the state and federal statutes.

      a.   Language

      There admittedly are a number of provisions of the Louisiana statute that closely parallel provisions in the federal Rehabilitation Act. For instance, one Louisiana court was persuaded by such parallelism to look to jurisprudence under the Rehabilitation Act for guidance in interpreting the term "handicapped person."[41] In the instant situation, however, the text of the pertinent provision of the state statute does not replicate

_____

   [40]   29 U.S.C. § 701 et seq.

   [41]   See Turner v. City of Monroe, 634 So.2d 981, 984-85 (La. App. 2d Cir. 1994). Under the Act, "`[h]andicapped person' means any person who has an impairment which substantially limits one or more major life activities or (a) has a record of such an impairment or (b) is regarded as having such an impairment." La. Rev. Stat. § 46:2253(1).
      Similarly, the Rehabilitation Act defines "individual with disability" to mean "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(8)(B).

the corresponding provision in the Rehabilitation Act. The federal statute provides in pertinent part that:

> No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination.[42]

The Louisiana statute, on the other hand, states that an employer shall not,

> [f]ail or refuse to hire, promote, or reasonably accommodate an otherwise qualified individual on the basis of a handicap when it is unrelated to the individual's ability with reasonable accommodation to perform the duties of a particular job or position.[43]

Obviously, then, the federal statute proscribes discrimination "by reason of her or his disability" only when disability is the sole motivating factor; in contrast, the state statute proscribes failure to accommodate a handicapped employee "on the basis of handicap." So, for failure to accommodate to be actionable under the state statute, handicap discrimination need not be the "sole" factor motivating the adverse employment decision. In addition, it is not clear whether "by reason of" in the federal legislation should be deemed congruent with "on the basis of" in the Louisiana statute, particularly when those phrases are read in light of the express purposes of their respective statutes.

b. <u>Purpose</u>

The express purposes of the federal statute are broader

---

[42]  29 U.S.C. § 794(a) (1988).

[43]  La. Rev. Stat. § 46:2254(C)(1).

than the express purpose of the state statute. We have already quoted the purpose provision of the Louisiana statute.[44] The purposes of the Rehabilitation Act with respect to the federal government's duty to eradicate handicap discrimination are more expansive and proactive:

> The purposes of the Rehabilitation Act are:
>
> (1) to empower individuals with disabilities to maximize employment, economic sufficiency, independence, and inclusion and integration into society, throughSQ
> > (A) comprehensive and coordinated state-of-the-art programs of vocational rehabilitation;
> > (B) independent living centers and services;
> > (C) research;
> > (D) training;
> > (E) demonstration projects; and
> > (F) the guarantee of equal opportunity; and
> (2) to ensure that the Federal Government plays a leadership role in promoting the employment of individuals with disabilities, especially individuals with severe disabilities, and in assisting States and providers of services in fulfilling the aspirations of such individuals with disabilities from meaningful and gainful employment and independent living.[45]

Although the statements of purposes in both statutes are steeped in altruism, we perceive their approaches to be sufficiently different to eschew reliance on parallel legislative purposes.

> c. Extant Federal Law

Even if we were to look to federal law for guidance, we

---

[44] La. Rev. Stat. § 46:2252. See quoted text of provision accompanying note 38, supra.

[45] 29 U.S.C. § 701(b).

would find none regarding our specific question. To recover under the Rehabilitation Act, a plaintiff generally must prove that he (1) was an individual with a disability; (2) was "otherwise qualified"; (3) worked for a "program or activity" that received federal financial assistance; and (4) was adversely treated solely because of his disability.[46] The parties have not cited a single case construing the Rehabilitation Act, and we have found none independently, that considersSQmuch less decidesSQwhether an employee must prove intentional discrimination to recover compensatory damages for his employer's refusal to make a reasonable accommodation. The probable explanation for this dearth of jurisprudence on the salient point may lie in the observation that, in the federal context, the concept of reasonable accommodation almost always arises as a subissue in a claim that an employer violated the Rehabilitation Act by failing to hire or promote a disabled individual, not as a free-standing failure to accommodate claim for compensatory damages. But whatever the reason, there are simply no cases on point (or at least we have found none).

Kelly attempts to rely on <u>Alexander v. Choate</u>[47] to support his argument that, to prove his reasonable accommodation claim, he should not have been required to show that BPS intentionally discriminated on the basis of his handicap. But, as BPS observes,

---

[46] <u>See</u> <u>Chandler v. City of Dallas</u>, 2 F.3d 1385, 1390 (5th Cir. 1993), <u>cert. denied</u>, 114 S.Ct. 1386 (1994).

[47] 469 U.S. 287 (1985).

33

the reasons that the plaintiff in Alexander was not required to prove intentional handicap discrimination was because Alexander involves disparate impact.[48] Not so Kelly's reasonable accommodation claim; it involves disparate treatment, which does require a showing of intentional discrimination.[49] In Alexander, the Supreme Court advised the courts to consider "two powerful but countervailing considerationsSQthe need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds."[50] The Court observed that "discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifferenceSQof benign neglect."[51] In Alexander, therefore, the Court expressly rejected the notion that a plaintiff is required to show discriminatory intent to establish a prima facie case of disparate impact under § 504, and required only that a plaintiff prove his employer's failure to make "reasonable" modifications to accommodate the handicapped. As Kelly's case is one of disparate treatment, however, his analogical reliance on Alexander is misplaced. Federal statutory and jurisprudential sources are inapposite when the question is whether intent is an essential

---

[48] See id. at 293-99.

[49] See, e.g., Pesterfield v. Tennessee Valley Auth., 941 F.2d 437, 443 & n.2 (6th Cir. 1991) (plaintiff must prove discriminatory intent in case alleging disparate treatment, but no such proof is required in case alleging disparate impact).

[50] Alexander, 469 U.S. at 299.

[51] Id. at 295.

34

element of recovery under the Act for failure to accommodate. Suffice it that, from our review of the language and purpose of the Act, we find no manifest injustice resulting from the district court's jury instruction requiring intentional handicap discrimination for Kelly to prevail on his reasonable accommodation claim. And, absent manifest injustice, there is no plain error.

## III

## CONCLUSION

Kelly has failed to convince us that the ambit of the Act, which governs his reasonable accommodation claim, is broad enough to reach beyond intentional handicap discrimination and encompass unknowing, negligent or benign handicap discrimination that produces a failure to make a reasonable accommodation. We thus find no plain error, and thus no reversible error, in the district court's jury instruction that, for Kelly to prevail, the jury had to find intentional discrimination on account of handicap. Neither do we find reversible error in the court's rulings excluding testimony proffered by Kelly. For the foregoing reasons, therefore, the judgment of the district court is, in all respects, AFFIRMED.