United States Court of Appeals,

Fifth Circuit.

No. 95-30880.

Tommy L. SWANSON, Plaintiff-Appellee/Cross-Appellant,

v.

GENERAL SERVICES ADMINISTRATION, Roger W. Johnson, Administrator, Defendant-Appellant/Cross-Appellee.

April 24, 1997.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before KING, JOLLY and DENNIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this appeal, we once again address the nature and degree of evidence required to support a jury verdict in a Title VII action alleging race discrimination and retaliation. Tommy L. Swanson sued his employer, the General Services Administration ("GSA"), alleging race discrimination and retaliation. Judgment was entered upon a jury verdict in favor of Swanson, and GSA appeals. Following well-established precedent, we conclude that the evidence presented in this case was insufficient to support the verdict because Swanson failed to offer competent evidence suggesting either that GSA's non-discriminatory explanations were pretextual, or that illegal discrimination was a motivating factor notwithstanding the existence of a legitimate explanation.

I

Swanson has worked for GSA since 1973. Swanson has received both automatic and merit-based promotions, and has worked in

1

several cities of GSA "Region Seven," which is headquartered in Fort Worth, Texas. At the beginning of 1988, Swanson served as a Building Manager in Little Rock, Arkansas; Swanson's government rank at that time was GS-11. In the summer of 1988, there was a vacancy announcement for a "Supervisory Building Management Specialist" at the newly-conceived GSA "Facility Support Center" in New Orleans. Swanson applied for and was awarded the position, which carried a rank of GS-11/12. Because Swanson had already served in a GS-11 capacity for some time, he was promoted to GS-12 upon his arrival in New Orleans in October of 1988.

Many of Swanson's difficulties in New Orleans related directly to a series of organizational changes in the New Orleans office structure. The GSA office in New Orleans was originally only a "Field Office." In 1988, a GSA reorganization effort determined that the New Orleans office should be expanded and redesignated a "Facility Support Center." Mr. Glenn Moore, previously head of the New Orleans Field Office, became Director of the New Orleans Facility Support Center as a part of the reorganization.

An internal GSA document prepared by the regional office, dated June 24, 1988, outlined the changes to the New Orleans office, and identified four separate "branches" of the new Facility Support Center: Real Estate, Design and Construction, Contracts, and Real Property Management and Safety. The vacancy announcement to which Swanson replied announced the opening for the head of the Real Property Management and Safety branch. Moore hired Swanson for this position, believing at the time that Swanson would be a

branch chief and that the new Facility Support Center could offer its branch managers career advancement opportunities.

Unknown to either Moore or Swanson, however, the June 1988 document labeling Swanson's department a "branch" was incorrect. A second document, dated September 7, 1988, no longer listed Swanson's position as the head of a branch. Although Swanson's "branch" had been formally eliminated even before he arrived in New Orleans, Moore and the other New Orleans employees did not realize the error until a December 1989 inspection, at which point Moore was told to eliminate the branch chief designation from Swanson's position.

The original description of Swanson's position indicated that he would directly supervise as many as five other employees: a building management specialist, a computer programmer, two physical security specialists, and one budget clerk. Swanson never directly supervised a computer programmer; Moore testified that this position was incorrectly listed in Swanson's supervisory description. The New Orleans office did have a computer programmer who occasionally accepted document inputting assignments from Swanson, because Swanson had requested assistance with his typing.

For more than a year, Swanson did supervise employees in the other four positions. However, the December 1989 inspection determined that the workload in Swanson's area would not support the building management specialist, and Moore was told to transfer her to the Real Estate branch. Later, a decision at the national level removed the entire security program from the buildings

3

management area; Swanson's two security specialists subsequently left the New Orleans Facility Support Center entirely. By 1992, Swanson supervised only the budget clerk, and received occasional secretarial assistance from Moore's secretary and a part-time student intern.

In January 1990, Swanson submitted a letter and request for transfer to Earl Eschbacher; Eschbacher was the Assistant Regional Administrator in Fort Worth, and he was Moore's direct superior at the time. Swanson indicated that he had developed severe asthma, his health was suffering, and he was unhappy that his status as a branch chief had been eliminated. Swanson stated that he felt he had been misled as to the advancement possibilities in the New Orleans position, stating that he "bought this scenario, hook, line and sinker." In the letter, Swanson requested that he be considered for a transfer to the Fort Worth or Dallas area.

Following his change in status, Swanson's working relationship with Moore and his co-workers rapidly deteriorated. Sometime in early 1990, Moore established a sign-out board that applied to Swanson and the employees he supervised. In his March review, Swanson received an overall rating of "3" out of a maximum of five. A "3" rating was "fully satisfactory," but was a step down from the "4" that Swanson had received the previous year; Swanson refused to sign the review, although the employee signature line did not indicate agreement with the rating.

In May 1990, Swanson sent a memorandum to Jimmie Jones, a GSA building manager who was a colleague rather than a subordinate of

4

Swanson. Swanson's memorandum included a demand that Jones perform some action in accordance with Swanson's specifications: "[t]he bottom line is I expect you all to stop whining, get off your duffs and do your damn job." When Jones complained to Moore, Moore responded by requiring Swanson to submit for Moore's review all correspondence Swanson intended to send beyond the New Orleans office.

In June 1990, Swanson filed his first EEO charge alleging racial discrimination. In July, Swanson sent an overnight package at GSA expense to a Mr. Robert Goodspeed at Goodspeed's personal post office box in Fort Worth. Goodspeed was a former member of the "Black Affairs Committee," apparently an informal committee of black GSA employees that was "recognized" by GSA, but had no official purpose within GSA. When the expense was discovered later that month, Moore demanded that Swanson reimburse GSA for the expense. When Swanson refused to do so, he was suspended for one day.

At some point in mid-1990, Swanson indicated to Moore that he wanted to tape-record their phone conversations. In August, without waiting for a response, Swanson secretly taped a personnel-related conversation among himself, Moore, Eschbacher, and Kathy Wyche, a GSA personnel representative. In January 1991, Swanson delivered a typed transcript of the taped conversation with cover letter to Mr. Hollis Rutledge, the head of GSA Region Seven. At trial, Swanson further conceded that he had initially denied taping the conversation, and that he had destroyed the tape. In

5

January 1991, Swanson was suspended on Eschbacher's recommendation for taping the phone conversation without the knowledge or consent of the other participants; Eschbacher testified that he had recommended a fourteen-day suspension, but that Rutledge reduced it to five days.

In April 1991, Swanson received a "letter of counseling" from Moore regarding his failure to follow procedures when requesting leave. In August, Swanson filed an assault charge with GSA security alleging that Moore had kicked Swanson about the ankle and lower leg; Moore stated that he stepped on Swanson's foot accidentally. The incident occurred during a confrontation between Moore and Swanson in Swanson's office, concerning a report Swanson needed to complete. In December, Moore sent Swanson a memorandum detailing ten occasions when Swanson had been tardy over the previous two months, and charging Swanson approximately two hours of annual leave.

Throughout this period, Swanson continued to file formal EEO complaints alleging race discrimination and retaliation. After his June 1990 complaint, Swanson filed a second complaint in February 1991. A third complaint was filed in September and a fourth in December. In April 1992, Swanson submitted a grievance to Casey Bowen, the Regional Director or Real Property Management and Safety, concerning his performance evaluation for that year, which had again been a "fully satisfactory" rating of "3," and complaining of his mistreatment in New Orleans. Also in April 1992, a hearing was held on Swanson's EEO complaints.

6

The entire "facility support center" concept for the New Orleans office eventually failed in mid-1992. Swanson was not the only manager who never supervised the full staff he anticipated; *none* of the center's branches ever achieved the full staffing indicated in the 1988 plan. In mid-1992, the New Orleans GSA office was downgraded from a "facility support center" to an "enhanced field office." In this reorganization, the managers of the Real Estate, Design and Construction, Contracts areas all lost their status as "branch chiefs," and Moore's position was downgraded to Real Property Officer of the New Orleans Enhanced Field Office. The Shreveport Field Office, which had reported to Moore under the Facility Support Center concept, reported directly to Fort Worth after the 1992 reorganization.

On May 12, 1992, shortly after the EEO hearing and the second day after Swanson had returned to the office from two weeks' vacation, Swanson received a "directed reassignment" that transferred him involuntarily to Fort Worth as a part of the reorganization of the New Orleans office. Swanson's position in Fort Worth remained "Building Management Specialist" and his grade remained "GS-12," but the position was no longer supervisory. Swanson was given one week to decide whether to accept the position, which began on August 3, 1992. Swanson accepted the reassignment under protest, and remained employed by GSA in Fort Worth during the pendency of this litigation.

## II

Swanson filed suit in federal district court on March 15,

7

1994, alleging race discrimination and retaliation for having filed EEO complaints. Because Swanson alleged discrimination occurring both before and after the effective date of amendments permitting jury trial in Title VII cases, the case was tried before *both* a judge and jury as factfinders. The parties agreed that the magistrate judge to whom the case had been referred would determine all issues relating to alleged acts of discrimination occurring before the November 21, 1991 effective date. The jury would determine liability and compensatory damages only on alleged acts occurring after that date. The trial itself was not bifurcated, however, and the jury heard all the evidence presented at trial.

At trial, Swanson argued that he had been the victim of repeated acts of racial discrimination and retaliation at the hands of Moore and Moore's superiors. Swanson presented testimony from Debra Mazant, his budget clerk; Manual Gaines, one of the two physical security specialists who reported to Swanson until 1992; Terry Duplessis, the local union president; himself; Moore; Eschbacher; and Herbert Patterson, the GSA security officer who took Swanson's report concerning the alleged assault in Swanson's office. Swanson additionally presented the transcript testimony of two former GSA employees who had contact with Moore and who stated that they had been discriminated against in a manner similar to Swanson.

Swanson identified six separate "adverse actions," that either occurred or were "continuing" after November 1, 1991, that he claimed were acts of illegal discrimination: (1) treatment of

8

tardiness, (2) denial of training, (3) denial of parking, (4) annual evaluation, (5) directed reassignment to Fort Worth, and (6) elimination of supervisory authority. Several additional acts that occurred before November 1, 1991, presented questions for the judge only. Swanson argued that the repeated acts of discrimination caused him mental pain and suffering, and contributed to his health problems and the eventual breakup of his marriage.

The members of the jury were instructed that if they found that one or more of the acts constituted illegal discrimination, they were to determine an appropriate amount of damages to compensate Swanson for any emotional pain or mental anguish proximately caused by the acts found illegal. As the jury deliberated, the court issued its verdict on the alleged discrimination before November 1, 1991; the court found for GSA on all alleged acts of discrimination, including those that were also submitted to the jury under a "continuing" violation theory. The jury, however, found for Swanson on four claims: treatment of tardiness, denial of parking, directed reassignment and the elimination of supervisory authority. The jury awarded $120,000 in compensatory damages. In accordance with the jury's finding of liability, on May 8, 1995, the court entered $39.42 in backpay on the tardiness claim, and $43,058.87 in costs and attorney's fees. Both Swanson and GSA filed motions for judgment as a matter of law. The court denied both motions on June 30, 1995. This appeal followed.

III

GSA appeals the court's denial of its motion for judgment as a matter of law on all acts occurring after November 1, 1991, alleging that the evidence was insufficient to support the verdict reached by the jury. Swanson contends that the evidence was sufficient, citing both "general evidence" of discrimination against blacks at GSA, and also claiming that the transcript testimony of Lillian Andrews and Shirley Whittington demonstrated that Moore followed a pattern of discriminating against blacks who filed EEO charges.

Swanson cross-appeals the court's finding of no liability prior to November 1, 1991, contending that the court's factual conclusion was clearly erroneous. Swanson further appeals the court's decision to grant only $38.42 in equitable relief, and the court's rejection of certain transcript costs associated with post-trial motions.

Swanson additionally challenges the court's decision to grant GSA's motion in limine excluding the testimony of witnesses who would have testified to alleged acts of discrimination committed by other GSA managers in other offices. The court found that because the witnesses could not testify to acts of discrimination by anyone in Swanson's supervisory chain, the testimony would be irrelevant. The court alternately found that because the proposed witnesses were expected to testify only to their *belief* that they had been discriminated against—rather than direct evidence of discrimination, or any formal finding of discrimination—the probative value of the testimony would be outweighed by the time

required essentially to relitigate each witness' claim.

## IV

## A

We first address GSA's challenge to the sufficiency of the evidence supporting the jury's verdict in favor of Swanson. We recently canvassed the law concerning sufficiency of the evidence claims in employment discrimination cases in our *en banc* decision in *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989 (5th Cir.1996) (*en banc* ). In *Rhodes,* we determined that the plaintiff's case must, at the very least, create a conflict in substantial evidence from which the jury may infer illegal discrimination. *Id.* at 993.

In *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the Supreme Court outlined the series of burden-shifting steps through which a Title VII plaintiff develops evidence from which the jury may infer discrimination. First, the plaintiff must establish a *prima facie* case of discrimination, after which the burden shifts to the employer to *articulate* a legitimate, non-discriminatory explanation for the challenged action. *Id.* at 507, 113 S.Ct. at 2747. Once the employer satisfies this burden of production, the plaintiff must show that the employer's explanation is not the true reason, but is instead a pretext for illegal discrimination. *Id.* at 508, 113 S.Ct. at 2747.

*Hicks* reiterated that the "inference of discrimination" raised by the *prima facie* case serves *only* to force the defendant to come forward with a legitimate explanation, and once the defendant does

11

so, this inference "simply drops out of the picture." *Id.* at 507, 511, 113 S.Ct. at 2747, 2749 (*citing Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)). The plaintiff retains throughout the ultimate burden of proving that the defendant discriminated against him *because of* his race. *Id.* at 511, 113 S.Ct. at 2749. The inference of discrimination created by the *prima facie* case is gone. To satisfy the statutory burden, the plaintiff must offer *some* evidence, whether direct or circumstantial, that permits the jury to infer that the proffered explanation was a pretext for illegal discrimination. The trier of fact may not simply choose to disbelieve the employer's explanation in the absence of any evidence showing why it should do so. *EEOC v. Louisiana Office of Community Services,* 47 F.3d 1438, 1443-44 (5th Cir.1995) (*citing Elliott v. Group Medical and Surgical Serv.,* 714 F.2d 556, 562 (5th Cir.1983); *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984)).

Accordingly, the question we face in this appeal is whether Swanson produced any evidence that, if believed, sustains his burden of proof. Having carefully reviewed the arguments of the parties and the record in this case, we conclude that Swanson's evidence—construed in the light most favorable to the verdict—demonstrates at most that his working relationship with his supervisors was hostile and unpleasant. Swanson simply offered no evidence that tends to disprove GSA's non-discriminatory explanations; nor did he offer any evidence that otherwise

12

connects the adverse actions in question to Swanson's race or his filing of EEO complaints.  We address in turn each action upon which the jury found liability.

(1)

*Treatment of Swanson's Tardiness*

Swanson argued that Moore's December 1992 memorandum concerning Swanson's repeated tardiness was an act of discrimination against him because of his race and because he had filed several EEO complaints.  The memorandum identified ten specific occasions over the previous two months when Swanson had arrived late for work and charged Swanson two hours of annual leave for the infraction.

Swanson made no real effort to show pretext:  he never denied that he had arrived late at his office on those dates.  Nor did Swanson argue that charging annual leave was an inappropriate or excessive response.  Furthermore, Swanson did not attempt to show that other white managers had been late without similar penalties. He did testify that, for at least *some* of the dates, he did not "consider himself late" because, in one case, an employee had called Swanson at home early in the morning, delaying Swanson's departure for work.  On one or more other unspecified occasions, Swanson stated, he had been stopped in the hall by building tenants because they recognized him as a building management employee, and had some building-related question or concern.  Even if Swanson specifically had offered explanations for each instance of tardiness, however, such testimony alone would not show pretext.

13

The pretext question is not a question whether *Swanson* "considered himself" late, but whether *Moore* considered Swanson late when he decided to charge Swanson with annual leave for his tardiness. Swanson conceded that, on those occasions when he arrived late, he did not go to Moore with any explanation.[1]

Rather than attempting to show pretext, Swanson's testimony focused on a complaint that his comings and goings were unfairly "micro-managed," and that he was "watched" closely while other white managers were not. Both Swanson and Debra Mazant, Swanson's budget clerk, testified that Swanson was "watched" closely by Edie Fenstermacher, Moore's secretary. Again, we note that Swanson never attempted to show that white employees were regularly late but not "watched."

Even *assuming* that an employee may claim discrimination by being "caught" unfairly in a work rule infraction without a demonstration that others committed similar infractions, Swanson's evidence falls short. Mazant testified that Fenstermacher seemed to be watching to see when Swanson would arrive, but Mazant also testified that Fenstermacher was the office's time and attendance clerk, and that Mazant herself had occasionally been forced to go

---

[1]Swanson argued that Moore should have come to *him* to ask why he was late and whether Swanson was experiencing any problems. Swanson further insisted that because he, Swanson, was a manager, Moore should have dealt with the tardiness problem "informally." Moore testified, and Swanson did not deny, that he had counseled Swanson on several prior occasions about Swanson's lateness, and even suggested that Swanson change his work hours. Without evidence that Moore's response was inappropriate, or that similarly situated employees were treated differently, there was no evidence from which the jury could infer discriminatory intent.

14

to Moore with problems when Swanson was late and could not be reached. Mazant's testimony simply does not connect the close scrutiny of Swanson's arrival with either his race or his filing of EEO claims.

In fact, the only testimony that Swanson offered that connected the scrutiny to his race were conclusory statements by Shirley Whittington and Lillian Andrews that blacks were closely "watched." Whittington testified that whites "could leave out any time that they wanted" while "the blacks were always, like, you know, you sort of better be on time or something was said or you were watched." Swanson argues that this testimony is sufficient to sustain the jury's verdict on the tardiness claim because it shows a pattern of discriminating against blacks by scrutinizing them more than whites. We disagree.

Like much of the "evidence" upon which Swanson relies, Whittington's and Andrews' statements are not "evidence"—they simply reflect the *opinions* of the witnesses on a fact issue that is for the jury to decide. Without testimony of the circumstances, or without examples of blacks who were scrutinized while similarly-situated whites were not, a broad, generalized statement that black employees were "watched" more closely than whites is incompetent to establish a pattern of discrimination. *See, e.g., Odom v. Frank,* 3 F.3d 839, 849 (5th Cir.1993) (rejecting anecdotal and speculative opinion testimony concerning an "unwritten policy" discouraging advancement of older employees).

(2)

15

*Denial of Parking*

Swanson argued that he was denied parking in the basement of the Hale Boggs Courthouse, the building where GSA's New Orleans office is located, on the basis of his race. GSA responded that Moore distributed a limited number parking spaces on the basis of a ranking system that awarded spaces to the highest ranked individuals, and then, as spaces later became available, to those GS-12 employees who were branch chiefs.

Swanson argued that this explanation is pretextual because he was believed to be a branch chief until December of 1989, yet he was not awarded an in-building parking space even though other branch managers received parking spaces "when they arrived." Yet Moore testified that in early 1988, he was the only GSA employee with in-building parking. Later in 1988, Moore obtained two additional parking spaces, and awarded them to Tom Sarver, the Field Office Manager who was ranked GS-13, and Ron Snow, who arrived shortly after Swanson to serve as the chief of the Real Estate branch. Swanson pointed to Snow, arguing that when Snow arrived he was a GS-12 branch manager like Swanson. GSA produced evidence that Snow's position was a GS-12/13 while Swanson's was a GS-11/12. Moore further testified that in 1988 and 1989, the other white GS-12 branch managers, including Evelyn Morris and Elvera Pigg, did not have in-building parking. Moore testified that additional parking spaces were not available until early 1990; these spaces were then awarded to Pigg and Ed Wortmann, both GS-12 branch chiefs. By early 1990, the GSA inspection had revealed that

Swanson had been incorrectly labeled a branch chief. Moore testified that neither Swanson nor Alex Deverede, a white GS-12 with greater supervisory responsibilities than Swanson, ever received in-building parking.

As complicated as the parking explanation may be, the uncontroverted evidence nonetheless establishes a legitimate ranking system for awarding limited benefits, and that this ranking system excluded whites who shared Swanson's rank. Swanson did not offer evidence that contested Moore's testimony concerning either the timing or the rank of the individuals who received parking. Nor did Swanson offer evidence that additional parking spaces *were* available, or that Moore could easily have obtained sufficient parking spaces for all the supervisory GS-12 employees.

The only evidence Swanson offered that purported to show that the distribution of parking was discriminatory, was the testimony of Lillian Andrews, who testified that Moore, who supervised her previously, took away her parking space. Andrews testified that Moore claimed the space was needed for another agency. Andrews also testified, however, that her white colleagues of similar rank did not even *have* parking spaces. By way of explanation, Andrews stated that her white colleagues did not need parking spaces, because, she thought, one did not drive and the other rode to work with her husband.

The fact that Moore "took away" Andrews' parking space when the space was required by another agency—an explanation that neither Andrews nor Swanson contested—is not evidence that Moore

17

discriminated against blacks in the distribution of parking. Undisputed testimony at trial revealed that, in April 1992, Pigg and Wortmann, both white GS-12 branch chiefs, similarly lost their parking spaces when an incoming agency needed parking for its employees. Again, Swanson offered no evidence to contest Moore's testimony that the number of parking spaces available to GSA employees fluctuated according to the needs of tenant agencies.

As with the claim concerning the treatment of his tardiness, Swanson presented no competent evidence from which the jury could conclude either that Moore's description of his system for distributing parking spaces was false, or that illegal race discrimination nonetheless motivated Moore's decision to deny Swanson an in-building parking space. Swanson offered only the conclusory opinion of another employee that Moore discriminated against her because of her race when he "took away" her parking space. Yet there was no *evidence* from which the jury could infer that race, rather than rank and limited availability, was the dispositive factor. Without such evidence, there was no legitimate basis from which the jury could disregard GSA's proffered non-discriminatory explanation.

(3)

*Directed Reassignment to Fort Worth*

Swanson's claim that his directed reassignment to Fort Worth was discriminatory focuses upon the contention that the directed reassignment was an action taken against him in retaliation for his

18

EEO activities.[2]  GSA responded that the directed reassignment was part of the downgrading of the New Orleans office from a Facility Support Center to an Enhanced Field Office.  Eschbacher offered undisputed testimony that the decision to transfer Swanson was made by Eschbacher in Fort Worth, and that Moore did not participate in the reassignment, except to deliver Eschbacher's letter to Swanson when the letter was received in the New Orleans office.

Swanson argued that the reassignment was retaliatory because it was issued shortly after an administrative hearing on Swanson's EEO complaint, and immediately following Swanson's return from a two-week vacation.  Eschbacher testified, however, that the changes to the New Orleans office had been planned for more than a year, and that there was inadequate work in the New Orleans office to support Swanson's position.  Eschbacher further testified that no other GSA "enhanced field office" had a "supervisory building management specialist."  Eschbacher explained that he had decided to move Swanson to Fort Worth in February, but waited until May to inform Swanson of the transfer, so that the transfer would not interfere with the EEO hearings being conducted in New Orleans.

Swanson never attempted to disprove any of Eschbacher's testimony, but maintained that the May 12 reassignment must have been retaliatory because on May 11, Swanson prepared a "civil

_____

[2]Swanson also stated that the only other employee *he* knew who had received a directed reassignment was also minority (Hispanic). Eschbacher testified that he had issued directed reassignments to as many as 12 employees during his tenure in Fort Worth.  Swanson presented no specific cases or statistical evidence to demonstrate that only minorities received directed reassignments.  Swanson also conceded that transfers were an anticipated part of his job.

19

rights" memorandum detailing alleged abuses and indicating that he would continue to prosecute his discrimination claims. Swanson testified that he sent the memorandum to Moore the same day, but Moore testified that he did not see it until May 12, after the directed reassignment had arrived from Fort Worth. Swanson offered no evidence to show that Eschbacher, who made the decision, was even aware of his civil rights memorandum.

Close timing between an employee's protected activity and an adverse action against him may provide the "causal connection" required to make out a *prima facie* case of retaliation. *Armstrong v. City of Dallas,* 997 F.2d 62, 67 (5th Cir.1993).[3] However, once the employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive. Swanson did not argue that the reorganization was a pretext; indeed, the undisputed evidence indicates that *most* of the New Orleans management personnel, including Moore himself, were adversely affected in May 1992 when the New Orleans office was downgraded to an "enhanced field office."

Although Swanson was the only person relocated to a different

---

[3]We observe, though, that the mere fact that some adverse action is taken *after* an employee engages in some protected activity will not *always* be enough for a *prima facie* case. Between June 1990 and May 1992, for example, Swanson filed four EEO complaints, issued various grievances and memorandums complaining of discriminatory actions, and participated in an EEO hearing and numerous meetings with his lawyer. If timing *alone* were enough, any action taken against Swanson after June 1990, no matter how justified, could be sustained as discriminatory. Title VII's protection against retaliation does not permit EEO complainants to disregard work rules or job requirements.

office, GSA offered uncontested testimony that there was insufficient work to support Swanson's position in New Orleans. Swanson never attempted to show that there *was* sufficient work for him to remain in New Orleans. He did not offer evidence that other managers in New Orleans also had insufficient work, but were not transferred. In short, Swanson failed to raise a factual dispute as to GSA's nondiscriminatory explanation for the transfer. Nor did Swanson offer evidence that connected the transfer to his EEO activity, from which the jury could infer that Eschbacher was motivated by a desire to *retaliate* against Swanson when he decided to transfer Swanson to Fort Worth.[4] Accordingly, Swanson's claim that his directed reassignment to Fort Worth was discriminatory fails for lack of evidence.

(4)

*Elimination of Supervisory Authority*

With respect to the specific incidents that led to Swanson's loss of supervisory authority, the record and briefs are unclear as to which incidents were considered by the jury in finding liability on this point. The jury was the factfinder as to liability for acts occurring after November 1, 1991. Swanson lost supervisory authority as a part of his directed reassignment to Fort Worth, but we have already concluded that there was insufficient evidence to

---

[4]It is, in fact, difficult to understand how Eschbacher would have viewed the transfer as retaliatory, given that Swanson had twice requested that he be relocated away from New Orleans, once specifically naming Fort Worth as a desirable option. Although Swanson testified that by May of 1992, he no longer wanted to move to Fort Worth, he conceded that he never told Moore or Eschbacher of this change of heart.

21

sustain a finding of liability on that basis. Swanson's job title, rank and pay remained the same in Fort Worth. Swanson offered no evidence that his workload in Fort Worth required that he have assistants to supervise, nor did Swanson argue that a more appropriate position with supervisory responsibilities was available when he was transferred. In fact, Swanson presented no evidence whatsoever concerning his position in Fort Worth.

The record does not reveal exactly when in 1991 the two physical security specialists, Manuel Gaines and Larry Moore, were removed from Swanson's supervision, but Swanson did not dispute Moore's testimony that the decision to separate security operations from building management entirely was made at the national level. The jury therefore could not have inferred that the local or regional GSA officials discriminated or retaliated against Swanson by removing the security specialists.

The jury *might* have based its verdict on the loss of supervisory authority caused by the removal of the computer programmer position and the transfer of Alissa Ruth, the building management specialist, to the Real Estate branch, if the jury concluded that their earlier removal from his supervision constituted a "continuing violation." Assuming that the loss of supervisory authority may be a continuing violation, we nonetheless conclude that the evidence was also insufficient on this claim.

The pattern is familiar. Moore offered legitimate explanations for these actions. The computer programmer position had been incorrectly included in the description of Swanson's

22

supervisory responsibilities; Swanson's area of management had no need of a computer programmer. Ruth was transferred to Real Estate when, following the December 1989 inspection, Moore was informed that Swanson's area did not have enough work to support both Swanson and a lower-level building management specialist.

Swanson never offered evidence that these explanations were pretextual. Although Swanson repeatedly argued that he needed typing support because he was not a trained typist, he did not indicate any use in his area for a computer *programmer.* Furthermore, Mazant, Swanson's budget assistant, testified that none of the branch managers had administrative support just for typing—a statement that Swanson did not dispute. Swanson's only "evidence" of race discrimination in the elimination of supervisory authority were generalized and unsubstantiated statements by Swanson and Andrews that blacks were never allowed to supervise whites for very long. Such unsupported testimony is nothing more than a subjective opinion that is incompetent as evidence to establish Swanson's claim of discrimination. Furthermore, it is irrelevant to Swanson's specific claim as at least half of the subordinates who were "taken away" from him were black.

We conclude, therefore, that the evidence was insufficient to sustain the jury's finding of liability, and the court below erred when it denied GSA's motion for judgment as a matter of law.

B

Because we conclude that the evidence was insufficient to support the jury's verdict, we need not address Swanson's

23

cross-appeal concerning the amount of equitable damages and costs awarded. Additionally, for the same reasons cited above, we reject Swanson's argument that the court's finding of no liability on acts occurring prior to 1991 was clearly erroneous.

Swanson's last ground of appeal is a challenge to the district court's decision to exclude the testimony of several witnesses from offices other than New Orleans. Swanson argues that their exclusion was erroneous based on this court's recent decision in *Kelly v. Boeing Petroleum Services, Inc.,* 61 F.3d 350 (5th Cir.1995). In *Kelly,* the excluded witnesses would have testified to acts concerning the plaintiff's actual work environment. The court concluded that although a district court may abuse its discretion by summarily excluding work environment witnesses, the district court in Kelly's case did not do so, but in fact had carefully considered each witness.

Here, by contrast, the excluded witnesses were not New Orleans employees and could not testify to Swanson's work environment in New Orleans or to his relations with Moore. Swanson argues that the excluded witnesses would have testified to similar discriminatory actions, such as the denial of parking, retaliation after filing EEO complaints, and not being "allowed to supervise whites." Because the chain of command from these witnesses similarly led to Earl Eschbacher and Casey Bowen in the Fort Worth regional office, Swanson argues that their testimony would reveal a "pattern" that also affected Swanson.

The court below carefully considered the anticipated testimony

24

of each witness, and determined that the witnesses could offer only speculation that any adverse actions they suffered were the result of racial discrimination or retaliation. We conclude that the court did not abuse its discretion in rejecting this argument after individually considering the expected testimony of each witness.

V

In conclusion, we hold that the Swanson failed to produce sufficient evidence of either race discrimination or retaliation to sustain the jury verdict in his favor. Accordingly, the decision of the court below denying GSA's motion for judgment as a matter of law is REVERSED, and judgment is hereby RENDERED in GSA's favor.

REVERSED and RENDERED.

DENNIS, Circuit Judge, concurring in part and dissenting in part:

I respectfully concur in part and dissent in part. This case is on all issues very close to the line dividing minimally sustainable jury verdicts from those that are deficient in evidentiary basis. However, the evidence is of such quality and weight that reasonable and fair minded persons in the exercise of impartial judgment could find that, in a number of instances, the employer's explanations for its adverse employment actions were not worthy of belief and that the employee was the victim of intentional discrimination.

If the employer satisfies its burden of producing evidence that the complained of adverse employment actions were taken for legitimate, nondiscriminatory reasons, the presumption of discrimination disappears. *St. Mary's Honor Center v. Hicks,* 509

25

U.S. 502, 507, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). The disappearance of the presumption, however, does not mean that the jury cannot consider evidence introduced by the plaintiff to establish a prima facie case. A satisfactory explanation by the employer, supported by evidence, destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the jury in deciding whether the employer's explanation is worthy of belief and whether the employee has been the victim of intentional discrimination. *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 993-94 (5th Cir.1996)(en banc); See *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749; *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 1095 n. 10, 67 L.Ed.2d 207 (1981).

Once the presumption of discrimination disappears, the case is treated like any other civil case. *Guiberson,* 75 F.3d at 993. We test jury verdicts and motions for summary judgment for sufficiency of the evidence under the *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969)(en banc), standard. The standard for granting a Rule 56 motion for summary judgment or a Rule 50 motion for judgment as a matter of law is the same. *Id.* at 369 n. 4. In *Boeing,* after thorough study of the numerous prior decisions of this court which had dealt with the subject, as well as the different formulations of legal writers and commentators, the court announced the following standard:

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of

26

the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Id.* at 374-75.

Applying the Boeing standard to all of the evidence in the present case, in the light and with all reasonable inferences most favorable to the plaintiff, I conclude that there is evidence of such quality and weight that reasonable jurors in the exercise of impartial judgment could have reached different conclusions as to whether (A) the employer discriminated against Swanson because of his race in (1) placing him under surveillance and docking his accrued annual leave time for being late for work; (2) denying him parking privileges on an equal basis with other supervisory personnel; (3) denying him appropriate staff assistance; (4) giving him an improperly low annual evaluation, which deprived him of an opportunity for a promotion; and (B) the employer retaliated against Swanson by the above actions because Swanson filed complaints with the Equal Employment Opportunity Commission.

27

There was evidence that white employees were not monitored for late work arrivals and that the management watched black employees more closely for work rule infractions than other employees. There was also testimony that Swanson was the only manager who was required to sign in and out. Ms. Mazant testified that after Swanson filed his first complaint the work atmosphere changed and that close surveillance of Swanson began after his first grievance. Although Swanson was told he could not have parking privileges due to his lack of seniority and the lack of available space, there was evidence that less senior white employees were given parking spaces immediately upon their arrivals. There was evidence that Swanson was the only manager not allowed to park in the basement garage. In support of his complaint that he was denied adequate staff assistance, Swanson testified that he regularly stayed two hours late and came in on weekends to finish his work, and that he frequently had to type voluminous contracts.

On the other hand, I agree with the majority that the jury's finding that the employer reassigned Swanson to Fort Worth for discriminatory or retaliatory reasons is not supported by a sufficient basis in the evidence. The decision to relocate Swanson was made at the Regional level by management in Fort Worth. The employer gave a legitimate, nondiscriminatory reason for the reassignment—there was no longer a need for a Building Management Specialist in New Orleans. There is no evidence from which a reasonable inference could be drawn that the employer's Fort Worth regional office decision to reassign Swanson was connected with the

28

evidence of discrimination by his New Orleans superiors.

Accordingly, I concur in the majority's decision to reverse the jury verdict with respect to the employer's reassignment of Swanson to Fort Worth and to the resulting loss of his supervisory authority;  but I respectfully dissent from the majority's decision to reverse the jury's verdict in all other respects.