IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-31019

_____

PEGGY BERGERON,

Plaintiff-Appellant,

versus

SOUTHWEST LOUISIANA HOSPITAL ASSOCIATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Western District of Louisiana
(97-CV-1837)

_____

August 31, 1999

Before GARWOOD, DUHÉ and BENAVIDES, Circuit Judges.[*]

GARWOOD, Circuit Judge:

Plaintiff-appellant Peggy Bergeron (Bergeron) appeals the district court's grant of summary judgment in favor of defendant-appellant Southwest Louisiana Hospital Association, d/b/a Lake Charles Memorial Hospital (the hospital) dismissing her claims of sexual harassment and retaliatory discharge. We affirm.

**Facts and Proceedings Below**

---

[*]     Pursuant to 5TH CIR. R. 47.5 the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Bergeron began working as a technician in the hospital's emergency room (ER) in 1993. Bergeron also worked in the ER as an extern while attending nursing school. In January 1995, Bergeron was hired by the hospital as an ER nurse. Dr. Michael Lescord (Lescord) was at all times an employee of Emcare, Inc., a physician organization which supplies doctors to the ER under contract with the hospital. Lescord commenced working in the ER in 1993. When the hospital considered hiring Bergeron as an ER nurse, the hospital's ER nurse manager Paul Fuselier (Fuselier) inquired whether Lescord believed Bergeron would be a positive addition to the ER. Lescord responded affirmatively.

After Bergeron began working as an ER nurse, Lescord began to ask Bergeron to accompany him on rounds. Although ER doctors do not always request that nurses join them on rounds, it is not uncommon for ER doctors to do so. Bergeron alleges that Lescord requested her assistance on rounds too often, even when other nurses were available. Bergeron alleges that Lescord became irritated if she refused to join him due to conflicting responsibilities. Although Lescord never reprimanded Bergeron for refusing to accompany him, Bergeron states that Lescord's body language—such as sighing, turning around, or slapping a chart on a desk—indicated that he was unhappy. Nonetheless, Lescord continued to request Bergeron's assistance.

Lescord once touched Bergeron's shoulder. Lescord approached Bergeron to discuss a patient, holding the patient's chart in his left hand. Lescord then placed his right hand on

2

Bergeron's right shoulder. Lescord did not rub or caress Bergeron's shoulder in any way, but only rested his hand there for about one second before Bergeron pulled away. Lescord backed away immediately, and did not say anything. Bergeron walked away, and Lescord did not follow her. Bergeron admits that it is not uncommon for doctors to approach nurses in this manner when discussing patients, and that the touching was not in any way sexual. However, Bergeron felt uncomfortable.

Both Lescord and Bergeron identify a single incident in the spring of 1995, when Lescord loudly scolded Bergeron in the ER, as the beginning of a serious conflict between them. A private doctor sent a patient to the ER. The patient had experienced chest pains the night before. The doctor telephoned the ER and spoke to Bergeron. The doctor told Bergeron that he would come to the hospital to meet the patient, and asked Bergeron to do some lab work when the patient arrived. Because the patient's vital signs were stable, Bergeron did not immediately notify an ER doctor of the patient's arrival. When test results revealed that the patient's cardiac enzymes were abnormal, Bergeron showed Lescord the patient's chart. The patient had been in the ER for approximately one hour at this point.[1] Dr. Lescord was very angry that he had not been notified earlier about the patient's presence in the ER. Lescord threw the chart at the ground and

---

[1]    Lescord and the hospital administrators suggest that the patient had in fact been in the ER for two hours at this point. However, on this summary judgment review, we view all facts in the light most favorable to Bergeron.

yelled, "Why am I just being notified now?" Lescord immediately ran into the patient's room and yelled at Bergeron to get the patient on oxygen.

As Lescord was leaving his shift that evening, he approached Bergeron and attempted to explain that his comments should be interpreted as constructive criticism. Bergeron did not interpret Lescord's statement to be an apology, but instead an assertion that "I'm the doctor, . . . what I say goes." After the incident, Lescord spoke to Fuselier and stated that anytime a patient with chest pains arrived, the nurses should notify a doctor immediately. The incident was later discussed in an ER committee meeting, although Bergeron's name was not specifically mentioned. Fuselier attributed the error to Bergeron's inexperience. However, Bergeron insisted that she did nothing wrong. Since the private doctor was going to meet the patient at the hospital, Bergeron believed she was not required to notify an ER doctor. Also, Bergeron asserted that the policy requiring patients with chest pains to be seen immediately by doctors did not apply because the patient had not had chest pains that day.

After this incident, Lescord's professional relationship with Bergeron soured. Lescord surmised that his abrupt manner had offended Bergeron. Lescord stated that Bergeron became very quiet and sullen, and essentially would not speak to him. After approximately two weeks, Lescord asked Bergeron to speak with him in his office. Lescord attempted to discuss constructive criticism with Bergeron. Bergeron alleges that Lescord stated

that he would have to be a lot more sensitive with her. Bergeron began crying, at which point Lescord allegedly "told [her] that he had a shoulder for [her] to cry on and he said [he had] a lot of pull with the administration."

Bergeron's relationship with Lescord did not improve after the meeting. Bergeron enlisted the aid of her fellow nurses to arrange work assignments so that Bergeron would not have to interact with Lescord. In the ER, nurses were not assigned to work for any particular doctor, but instead were assigned to stations. So, for example, if Bergeron's shift overlapped with Lescord's, Bergeron would request to work in the triage area, where she did not have to interact with the doctors. Once, while working in triage, Bergeron briefly walked out of the area to deliver a patient's chart. Lescord asked Bergeron to hold a telephone and wait for the other party to return to a call for him. Bergeron refused, stating that she had to return to the triage. Although Lescord did not say anything, Bergeron states that he slapped his hand down on the desk, indicating anger. Lescord admits that nurses are not required to assist doctors while working in triage, but other nurses generally would do so if asked.

A similar situation occurred one afternoon while Bergeron and a few other ER employees, among them a technician, were standing around the nurses' station. Lescord approached Bergeron and requested assistance holding a baby during a lumbar puncture. As this was a task that a technician could perform, Bergeron

5

asked the technician to assist Lescord.  Lescord stated that he would need additional help, and Bergeron replied that she would have to find someone else.  Bergeron explains that she was required to stay by the ambulance phone because she was the only nurse in the area and only nurses were allowed to answer the ambulance phone, although it is not clear whether she articulated this concern to Lescord.  Lescord told Bergeron that she needed to start setting her priorities.  After this incident, Lescord complained to Fuselier.

Lescord reprimanded Bergeron for failing to acknowledge his orders.  Lescord had asked Bergeron to get a patient an ice pack.  Bergeron did not acknowledge the request.  Lescord said, "You need to acknowledge me when I'm speaking to you."  Bergeron looked at him, refused to answer, and walked away.  Bergeron says she did not answer because she was afraid of getting in trouble.  According to Lescord, nurses customarily verbally acknowledge doctors' orders so that the doctors can know that their orders have been heard and will be carried out.  Bergeron's refusal to acknowledge his orders concerned Lescord.

Lescord snapped at Bergeron on an occasion when Bergeron and two other people were standing around a monitor trying to discern a rhythm.  Bergeron suggested changing leads, and attempted to change the lead, but Lescord pushed her hand away and snarled, "I want it in this lead."  On another occasion, Bergeron was in the process of discharging a patient whom Lescord was not ready to discharge.  Lescord grabbed the patient's chart out of Bergeron's

6

hand and threw it down on the counter.

Once, when treating a patient, Bergeron asked another nurse to find a doctor. The other nurse asked a different doctor to treat the patient, even though Lescord was actually behind a divider in the same room. Lescord did not confront Bergeron about this incident, but later complained to Fuselier that Bergeron had deliberately found another doctor, despite the fact that he was readily available and should have treated this patient. Bergeron denies responsibility because she did not personally summon the doctor.

After this incident, Lescord told Fuselier that he wished to speak again with Bergeron in his office. Bergeron recounted that conversation as follows:

> "And he said, 'What is it, Peggy? Don't you like me?' And I said, 'No, I don't. I don't trust you. I don't feel safe working with you.' And he said, 'So you're not going to come with me in patients' rooms, take care of patients?' And I said, 'That's not what I'm saying. What I'm saying is I don't like it but I'll do it because it's my job.' And he said, 'So you're saying that you're not going to work with me?'"

At this point, Bergeron refused to speak further with Lescord without a third person present. At Bergeron's request, Lescord found Fuselier, and the conversation resumed with Fuselier present. Lescord stated that he was concerned that the negative atmosphere in the ER was compromising patient care. Bergeron and Lescord agreed to attempt to act professionally toward each other. According to Lescord, this conversation took place perhaps as shortly as a few days before Bergeron complained of harassment.

There were also problems involving Bergeron's charting procedures.  Lescord expressed concern that Bergeron had once delayed treating a patient.  Bergeron argued that she did not delay the treatment, but Lescord had taken the chart away from her so that she could not document the treatment on the chart. Rebecca Rhodes (Rhodes), the hospital's Assistant Vice President of Patient Care Services, recalled having an extended conversation with Bergeron regarding a delay in reporting an elevated blood pressure while Rhodes was serving as interim nurse manager.

According to the hospital, a subsequent error in which Bergeron performed an unauthorized procedure on a patient played a central role in the decision to transfer Bergeron.  An elderly male patient entered the ER and Bergeron brought him to the telemetry.  After taking the patient's blood pressure, Bergeron sent someone to get a doctor and began an intravenous (IV) fluid bolus[2] on the patient.  Within five minutes Lescord arrived and began talking to the patient.  Lescord did not say anything to Bergeron regarding the IV bolus.  However, Lescord later discussed the incident with Deanna Harless (Harless), who had replaced Fuselier as nurse manager.  Lescord asked that Bergeron be "written up" for starting the IV without his authorization. Lescord stated that the saline IV was clearly contraindicated for

---

[2]     *Stedman's Medical Dictionary* defines "intravenous bolus," in pertinent part, as "a relatively large volume of fluid or dose of a drug or test substance given intravenously and rapidly to hasten or magnify a response."  *Stedman's Medical Dictionary* 220 (26th ed., 1995).

that patient.

Both Lescord and Sherry Haley (Haley), the hospital's Vice-President of Patient Care Services, asserted that nurses should not perform these procedures without a doctor's order. Haley alleged that Bergeron had insisted that it is a nurses' prerogative to start an IV bolus, and that Bergeron had stated that she would handle the situation the same way again. Harless stated that she felt that Bergeron had used bad judgment in this situation, and it was inappropriate to start the procedure without a doctor's order. Harless believed that Bergeron's judgment was clouded by the tension between her and Lescord. Bergeron alleged that Harless had told her that it was acceptable for a nurse to start a bolus in certain emergency situations. However, Bergeron stated that Harless had told her to always get an order first when working with Dr. Lescord. Bergeron said that she said agreed. The record does not reveal on what date this incident occurred, although it appears to have been close to the time that Bergeron was removed from the ER schedule.

Lescord agreed that in most respects Bergeron performed at the same level as other nurses with her level of experience. Lescord also acknowledged that errors occur frequently in the emergency room. The difference, according to Lescord, was that other nurses accepted criticism and correction, whereas Bergeron would simply turn her back and walk away if Lescord tried to correct her. Lescord was concerned to have no ability to discuss errors with a nurse while caring for critically ill patients.

Bergeron, however, felt that Lescord singled her out for harsh treatment.  For example, on the same evening that Bergeron started the IV, another nurse named Denise made a drug error, and disclosed the error to Lescord.  Although Lescord complained about the incident, he apparently told Denise that he would overlook the error.  Bergeron later complained to the administration about this apparent disparate treatment, and Denise was written up.[3]

On or about March 21, 1996, Bergeron told Rhodes that she had received a lot of complaints from Lescord, and that she feared that her job was in jeopardy.  Attempting to find a cause of the problem, Rhodes hypothesized that perhaps Bergeron's looks intimidated Lescord.

On March 27, 1996, Bergeron went to visit an attorney whom she had selected from the telephone directory.  That attorney happened to be a member of the same law firm as John Bradford (Bradford), an attorney who represented the hospital.  When Bergeron arrived, the attorney with whom she had an appointment was not available, and she was taken to Bradford's office.  Bradford explained that he represented the hospital and could not represent Bergeron.  Undeterred by the conflict of interest, Bradford offered to listen to Bergeron's story.  Bergeron told Bradford that she had been receiving complaints and was concerned

---

[3]     This story does not necessarily prove that Lescord subjected Bergeron to harsher treatment than other nurses, but is consistent with Lescord's testimony that Bergeron's refusal to admit errors and accept criticism constituted a significant part of their interpersonal conflict.

10

about losing her job. Bergeron told Bradford that she thought she might have an harassment claim. Bradford told Bergeron to speak to Haley and Rhodes.

The next day, March 28, 1996, Bergeron told Haley that she believed Lescord was unjustly criticizing her, and she feared losing her job. Haley told Bergeron that she should not worry because doctors did not hire or fire nurses, and Bergeron's job would be safe as long as she did her job and acted professionally. Bergeron told Haley that she had spoken to a lawyer, but that nothing came of it because the lawyer worked for the hospital. Later that day Bradford called Haley to ask whether Bergeron had taken his advice and spoken to her. Bradford told Haley that Bergeron thought she might have a sexual harassment claim.

After speaking to Bradford, Haley arranged a meeting between herself, Bergeron, and Rhodes. The meeting took place the following day, March 29, 1996. Haley and Rhodes told Bergeron that they had spoken to Bradford, and asked whether Bergeron felt she was being sexually harassed. Bergeron apparently stated that she felt it was "like sexual harassment." Rhodes and Haley instructed Bergeron to go to human resources and file a formal complaint immediately.

Bergeron complied, and immediately consulted Betty Mitchell (Mitchell), the hospital's Human Resources Director. Mitchell told Bergeron to submit a written complaint. Mitchell also told Bergeron to keep a log or journal of incidents involving Lescord,

11

and to turn that in to her as well.  Bergeron responded that she had already been keeping such a log.  Mitchell also informed Bergeron, although perhaps on a later date, that hospital personnel were reviewing her patient care records.  Mitchell could not, at the time of her deposition, identify the purpose of this investigation.

On April 2, 1996, Harless told Bergeron that Haley wanted to see her.  When Bergeron arrived at Haley's office, Haley quietly escorted Bergeron into a conference room where Bradford awaited her.  Bradford informed Bergeron that they would like her to transfer out of the ER.  Bergeron alleges that Bradford told her if she did not voluntarily transfer, they were "going to find something" in order to terminate her.  Bergeron also alleges that Bradford said, "It's just like a black person getting in trouble and calling it discrimination and blaming it on them;" and "You know, if you have a friend and that friend hurts you, you can overlook it.  If that person is not your friend you won't overlook it."  Bergeron told Bradford that she did not wish to transfer.  However, Bradford told Bergeron to think it over and get back to him.  Bradford denied threatening Bergeron.  Bradford claimed to simply have told Bergeron that if she filed a complaint, the hospital would have to investigate, and that the hospital could not guarantee her a job.  Bradford admitted offering to transfer Bergeron if she could not get along with Lescord.  No one other than Bergeron and Bradford attended the meeting, and neither made a memorandum of the meeting's events.

12

Also on April 2, Bergeron submitted a written complaint to Mitchell. The complaint stated that approximately one year earlier, Lescord began showing "an exceptional amount of attention" to Bergeron by requesting her assistance when other nurses were available. The complaint also alleges that Lescord "invad[ed her] personal space by putting his arm around [her] when discussing patient cases." The complaint continues:

> "Situations such ass [sic] this seemed to increase, making me more uncomfortable each time. At this time, Dr. Lescord began complaining to my head nurse that I 'was not doing my job.' My head nurse spoke with me on several occasions about these complaints and was unable to find any faults with my job performance. . . . Soon, he began to outwardly criticize my performance in front of patients and the nursing staff. . . .

> My complaint is that I feel that I have worked long enough under these conditions and it is past the point of harassment."

At one point in time, Bergeron and Mitchell discussed what positions might be available for Bergeron outside the ER. Mitchell offered Bergeron a position in ICU, or in a second unit outside the hospital. Also, the head nurse in the cath lab contacted Bergeron and informed her of an available position there. Bergeron interviewed at the cath lab, but felt that the job was inadequate because it would have paid less than her evening shift in the ER. Bergeron rejected the ICU position because, as she explained: "[Mitchell] told me that it could be available if I wanted it, like they were almost providing the position for me. And I wanted to be in a place where I was needed and not supplied to." Bergeron did not remember whether the pay for the ICU position would have been different from the

13

pay for her position in the ER.

In May 1996, the hospital collected statements from other ER workers, who were asked to comment on their observations of Bergeron's relationship with Lescord. Greenman observed that "[i]t appeared that Dr. Lescord seemed to ‹single out' Peggy's charts to find ‹mistakes' and make ‹corrections.'" Eleanor Stickney, RN, reported that "Dr. Lescord turns into a demon around Peggy Bergeron. He is demanding, accusatory, insulting, totally bizarre & uncalled for, and he does it in front of the rest of the staff." Jimmy Mayeux reported that the staff had always viewed Bergeron's relationship with Lescord as "strained" and "friction filled." He had noticed that Lescord spoke to Bergeron in a tone of voice indicating that it took great effort for Lescord to speak to Bergeron. However, Mayeux had not observed anything that he would interpret or construe as harassment. Harless reported that she had observed Bergeron crying on multiple occasions.

In June 1996, Mitchell repeatedly asked Bergeron to turn in the log or journal that they had discussed during their March 29, 1996, meeting. Bergeron refused to deliver the log because she felt it contained too much personal information. Instead, Bergeron gave Mitchell a list of witnesses. Bergeron told Mitchell that she wished the entire matter would "blow over."

On August 13, 1996, Bergeron received a letter from Sherry Haley stating:

> "The Human Resources Director, Betty Mitchell, has
> requested that you formalize your complaint in

14

reference to Dr. Michael Lescord on more than one occasion. You have refused her request and have told her that you would like this matter dropped. Our investigation reveals there was no sexual harassment and it is the hospital's position that this matter is officially over."[4]

On August 26, Bergeron received a letter from Haley and Rhodes, stating in part, "I have received information that your performance in the Emergency Center does not conform to good nursing practices. Your supervisor has recommended that you be removed from your work assignment." The letter continued to inform Bergeron that she had been removed from the ER schedule, and suggested that Bergeron contact Mitchell "for a transfer to a different department within the hospital."

Bergeron argues that being removed from the ER schedule amounted to a constructive termination. When the hospital removed an employee from the schedule, it meant that the employee would not be assigned to work. After an employee was off the schedule for thirty days, that employee was officially terminated. The hospital has not challenged Bergeron's assertion that the removal was a constructive termination. On August 28, 1996, Bergeron tendered her resignation.

Bergeron filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). On June 12, 1997, the EEOC issued Bergeron a Notice of Right to Sue. Bergeron sued the hospital under Title VII of the Civil Rights Act of 1964, as

---

[4] Bergeron adamantly denied having stated that she wanted the investigation dropped. Whether or not this is what Bergeron meant when she told Mitchell that she wished the matter would "blow over" is not material.

15

amended, 42 U.S.C. § 2000e, *et seq*. Bergeron alleged that she had been sexually harassed by Lescord and that she had been subject to unlawful retaliation as a result of her complaint against Lescord. The district court granted the hospital's motion for summary judgment as to both claims, and dismissed Bergeron's complaint.

## Discussion

"We review a district court's grant of summary judgment de novo, applying the same standard as the district court." *Shepherd v. Comptroller of Public Accounts of the State of Texas*, 168 F.3d 871, 873 (5th Cir. 1999) (citation omitted). Summary judgment is proper only where, viewing all evidence in favor of the nonmoving party, the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 106 S.Ct. 2548 (1986).

I. Sexual Harassment

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1), makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment claims generally fall into two categories. *Quid pro quo* sexual harassment arises where an

16

employer demands sexual consideration in exchange for job benefits. *See Jones v. Flagship International*, 793 F.2d 714, 721 (5th Cir. 1986). The second category of sexual harassment claims arise where harassment based upon sex creates a hostile working environment. *See id.* at 719-720. Bergeron's claim proceeds under the latter hostile work environment theory of sexual harassment.

In order to establish a hostile environment claim, a plaintiff must prove five elements: "(1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment affected a 'term, condition, or privilege' of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action." *Shepherd*, 168 F.3d at 873 (citing *Jones, supra*). Bergeron has not provided any evidence that she was subject to harassment based on sex.

Lescord never made any sexual advances nor sexually suggestive comments toward Bergeron. Lescord touched Bergeron only once, for only approximately one second, and immediately removed his hand when Bergeron backed away. Bergeron admits that it was not uncommon for doctors to touch nurses in this manner when discussing patients, and that the touching was nonsexual. Moreover, we have previously noted that touching a person's shoulder is not the sort of conduct which generally leads to finding a sexually abusive working environment. *See Shepherd*,

17

168 F.3d at 875.

Lescord allegedly told Bergeron, as she began crying, that he had a shoulder for her to cry on, and that he had a lot of pull with the administration. Bergeron has offered little context for these statements and no coherent theory as to what the statements meant. With some imagination, these statements might be construed as a sexual overture or threat. However, Bergeron's "subjective interpretation of [Lescord's] comments is insufficient to raise a fact issue as to sexual harassment." *See Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 555 (5th Cir. 1997) (citation omitted). Without more, these cryptic statements are simply too opaque to cast an air of sexual harassment over an otherwise gender-neutral conflict.

A hostile work environment may be based not only on conduct of a sexual nature in terms of sexual invitation or innuendo, but also on hostility or discrimination toward one sex generally. *See Oncale v. Sundowner Offshore Services, Inc.,* 118 S.Ct. 998, 1002 (1998) ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.") (quotation omitted). Still, a sexual harassment claim requires proof that the plaintiff's sex was a but-for cause of the harassment. *Jones*, 793 F.2d at 719. "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at ⊲discriminat[ion] ... because of ... sex.'" *Oncale,* 118 S.Ct. at 1002 (alteration in original).

Even accepting as true that Lescord turned into a "demon," unjustly criticized Bergeron, and behaved in a manner which was bizarre, insulting, and uncalled for, the record contains absolutely no evidence from which a reasonable jury could infer that Lescord's behavior was motivated by Bergeron's sex. Lescord never derided Bergeron based on her sex. There is likewise no evidence suggesting that Lescord conflicted with any of the several other female nurses in the ER, and in fact Bergeron complained that Lescord once treated Debbie, another presumably female nurse, too favorably. We also note that Lescord in fact recommended that the hospital hire Bergeron in 1994—a fact which tends to weigh against a finding of animus towards women. *Cf. Brown v. CSC Logic, Inc.,* 82 F.3d 651, 658 (5th Cir. 1996)(approving "same actor" inference that same actor's involvement in both employee's hiring and termination raises inference against discriminatory motive.). Bergeron offers only speculation that Lescord's behavior was based on Bergeron's sex. Bergeron's subjective belief that Lescord harassed her because she is a woman is worth little. *See Nichols v. Lewis Grocer,* 138 F.3d 563, 570 (5th Cir. 1998). "'[A] subjective belief of discrimination, however genuine, [cannot] be the basis of judicial relief.'" *Id.* (alteration in original) (quoting *Little v. Republic Refining Co., Ltd.*, 924 F.2d 93, 96 (5th Cir.1991)). Rhodes also suggested that perhaps Bergeron's looks intimidated Lescord. However, Rhodes' speculation about Lescord's motivation is worth no more than Bergeron's. *See Little*, 924 F.2d at 96

19

("[T]he evidentiary power of [a third party's] belief [as to employer's motivation] is subject to the same criticisms as [the plaintiff's] belief. [citation]. It should not matter that the belief belongs to a party other than the plaintiff.") (citation omitted).

Bergeron asks us to infer that Lescord's behavior was motivated by Bergeron's sex by the mere fact that he was a man and she was a woman. A mere difference in the sex of an alleged sexual harasser and sexual harassee is insufficient, by itself, to raise an inference of sexual harassment. Our rejection of this principle is implicit in the well-established rule, *supra*, that a plaintiff's subjective belief of discrimination—even where the alleged discriminator is outside the plaintiff's protected class—is insufficient to defeat summary judgment. The principle Bergeron proposes would defeat summary judgment in the vast majority of sexual harassment claims, irrespective of whether a plaintiff offers any proof whatsoever of sexual harassment. We cannot adopt a rule of law which presumes that all unpleasant workplace interactions between a man and a woman constitute sexual harassment. *See Oncale*, 118 S.Ct. at 1002 ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual connotations."). Bergeron has failed to show any genuine dispute of material fact based on actual, nonspeculative record evidence that Lescord harassed Bergeron because of her sex. *See* 42 U.S.C. § 2000e-2(a)(1).

20

Finally, in order to create an actionable hostile working environment, harassment must be "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *See Jones*, 793 F.2d at 719-20. Whether an environment is abusive or hostile is determined by considering all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 114 S.Ct. 367, 371 (1993). Whether an environment is sufficiently hostile or abusive to be actionable is viewed both objectively and subjectively. *Id.* at 370.

The district court found that if Bergeron had established that Lescord's conduct was sexual harassment, this element would be satisfied. However, it may be questioned whether a doctor's expressing anger when a nurse declines assistance, and publicly scolding her errors on a handful of occasions over the course of a year and a half could, from an objective view, constitute behavior so severe and pervasive as to create an abusive working environment. *See Southard*, 114 F.3d at 555 (finding isolated comments and unreasonable typing assignments insufficient to support hostile environment claim.). The Supreme Court has warned against transforming Title VII into a "general civility code," *Oncale*, 118 S.Ct. at 1002, and we find this admonition particularly compelling in a fast-paced, often stressful

21

emergency room setting.      Nonetheless, as we find no evidence that Lescord's behavior was motivated by Bergeron's sex, we need not resolve this issue today.  Because Bergeron failed to provide sufficient evidence to satisfy an essential element of her claim, summary judgment was properly granted.  *See Celotex*, 106 S.Ct. at 2552 (holding Rule 56(c) mandates summary judgment where party fails to provide evidence sufficient to establish essential element of claim for which that party would bear the burden of proof at trial).

II. Unlawful Retaliation

Bergeron alleges that the hospital removed her from the ER schedule in retaliation for her filing an harassment complaint. To establish a *prima facie* case for unlawful retaliation under Title VII, a plaintiff must show:  "(1) that she engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action."  *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996) (citation omitted); 42 U.S.C. § 2000e-3(a).

Title VII unlawful retaliation cases follow the *McDonnel Douglass/Burdine* burden shifting framework.  *See Texas Dept of Community Affairs v. Burdine*, 101 S.Ct. 1089, 1093-1095 (1981); *McDonnell Douglas Corp. v. Green*, 93 S.Ct. 1817, 1824-25 (1973). Once the plaintiff establishes a *prima facie* case of retaliation, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action.

22

*See Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 992 (5th Cir. 1996).  If the defendant introduces evidence supporting a valid, nondiscriminatory reason for the employment decision, the presumption of retaliation raised by the plaintiff's *prima facie* case disappears.  The burden then shifts back to the plaintiff to prove that the employer's proffered reason is actually a pretext for retaliation.  *See id.* at 993.  *See also Burdine*, 101 S.Ct. at 1093.  The burden of persuasion remains with the plaintiff at all times.  *See Burdine*, *supra*.

The hospital has not challenged either that Bergeron engaged in a protected activity under Title VII[5] or that Bergeron's removal from the ER schedule constituted an adverse employment action.  The only remaining element is causation.  To establish *prima facie* evidence of causation, a plaintiff must show only that retaliation was a motivating factor behind the employment decision, and need not at this point show that it was the but-for or sole cause of the employment decision.  *See Long,* 88 F.3d at 305 n.4.

Bergeron alleged that on April 2, 1996, Bradford threatened that the hospital would find means to terminate Bergeron's

---

[5]    A plaintiff engages in protected activity if she "oppose[s] any practice made an unlawful employment practice" by Title VII, 42 U.S.C. § 2000e-3(a).  Under this section, a plaintiff must demonstrate that she had a reasonable belief that the employment practice she opposed was unlawful.  *See id.; Long*, 88 F.3d at 304.  The district court found that Bergeron could not have reasonably believed that she had been sexually harassed.  Because we conclude that Bergeron has failed to raise a jury issue on the ultimate issue of whether the hospital retaliated against her, we do not reach this issue.

employment if Bergeron did not voluntarily leave the ER.  If believed, these threats may provide evidence of retaliation. Furthermore, Bergeron was removed from the ER schedule less than two weeks after the hospital concluded the investigation into Bergeron's allegations of harassment.  A short time span between an harassment complaint and an adverse employment action may raise an inference of retaliation.  *See Swanson v. General Services Administration,* 110 F.3d 1180, 1188 (5th Cir. 1997) (citation omitted).  We therefore find that Bergeron did establish a *prima facie* case of retaliation.

However, Bergeron has not provided sufficient evidence for a jury to conclude that the hospital's articulated reasons for her transfer were pretext, and that retaliation was the but-for cause of her transfer.  The hospital claimed to have transferred Bergeron because her work failed to conform to good nursing practices, specifically, because Bergeron performed an unauthorized procedure and refused to acknowledge such as error. The hospital also asserted that Bergeron's conflict with Lescord was jeopardizing patient care, and hospital personnel believed Bergeron might perform better in a different environment. Bergeron admitted starting the IV fluid bolus without authorization, and insisted that nurses may, in certain circumstances, perform those procedures without authorization.[6]

---

[6]     Bergeron stated that she had agreed to obtain permission before performing the procedure when working with Lescord, but her testimony is silent as to whether she refused to do so when working with other doctors.  On appeal, Bergeron does not dispute the hospital's assertion that she refused to change her nursing

24

Bergeron also admitted that she refused to work or speak with Lescord, that these problems had occurred over the course of more than a year, and that she frequently had broken down and cried at work due to Lescord's treatment of her. Thus, the hospital's articulated reasons for transferring Bergeron are objectively reasonable and have not been seriously disputed. *Cf. Elliott v. Group Medical & Surgical Service*, 714 F.2d 556, 567 (5th Cir. 1983) ("where, as here, the reasons articulated are rational ones, the objective truth of which is not seriously disputed, the burden of establishing them as pretextual is a heavy one indeed").

Nonetheless, Bergeron argues that these articulated reasons for her transfer were merely a pretext for retaliation. To prove retaliation, a plaintiff must show that but for the retaliation, she would not have suffered the adverse employment action. *See*

practices with respect to this procedure.

> "Q. Am I correct in understanding that [Harless] . . .
> felt that that should not have been done, namely the
> starting of the IV and bolus without first getting the
> doctor's orders?
> A. I remember what she told me. She told me, 'Peggy,
> in an emergency room setting in a practical situation
> here, it is acceptable.'
> Q. What's acceptable?
> A. Starting and IV and giving a bolus. If you don't do
> that on some patients before a doctor even gets there,
> a patient may die.
> Q. You felt this patient was in extremis?
> A. Not going to die. I didn't know at the time. We
> had no lab work. We didn't know what was going on.
> His blood pressure was low. Dee said since it's Dr.
> Lescord, always get an order the next time.
> Q. Did you agree with her or disagree?
> A. I told her okay. It wasn't an agreement or a
> disagreement. I just said I would do it."

*Long,* 88 F.3d at 305 n.4. "In other words, even if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct." *Id.* (citing *Jack v. Texaco Research Ctr.*, 743 F.2d 1129, 1131 (5th Cir. 1984)). The plaintiff must offer actual evidence of a retaliatory motive and not merely supply an alternate theory for the employment decision. "The trier of fact may not simply choose to disbelieve the employer's explanation in the absence of any evidence showing why it should do so." *Swanson,* 110 F.3d at 1195.

Bergeron argues that the short time span between the conclusion of the hospital's investigation and her removal from the ER shows evidence of pretext. However, while a close temporal connection may provide an inference of causation in a plaintiff's *prima facie* case, it does not constitute actual evidence of pretext. *See Swanson*, 110 F.3d at 1188. Moreover, this is not a case where an unrelated employee problem suspiciously arises after that employee files a grievance. Here, Bergeron was asked to transfer because hospital personnel determined that her conflict with Lescord, which her complaint brought to particular prominence, was obstructing her judgment and performance. In this sense, the temporal connection between the investigation, during which the hospital uncovered the full details of the conflict, and the transfer is completely consistent with the hospital's proffered reasons for the

26

transfer.

Similarly, Bergeron points out that nursing administrators conducted an investigation into Bergeron's patient care records, separate from the sexual harassment investigation. It is unclear whether this investigation began before or after Bergeron complained of sexual harassment. In either case, such an investigation would be necessary in order to properly investigate whether or not Lescord had been unjustly criticizing Bergeron's nursing practices. The investigation would also be a reasonable and lawful consequence of Bergeron's pointing out to hospital administrators that she had received an unusual number of complaints.

In the letter informing Bergeron that she had been removed from the ER schedule, Haley and Rhodes stated that they had received information that Bergeron's nursing performance did not conform to good nursing practices. Bergeron attempted to manufacture a factual dispute by pointing out that in the depositions Haley and Rhodes claimed to have received this information from Harless, whereas Harless had answered "no" when asked whether she had told Haley and Rhodes that Bergeron's performance failed to conform to good nursing practices.

Had Harless' response occurred in a vacuum, it might indeed have contradicted Haley's and Rhodes' testimony. However, in her *very next* deposition response, Harless discussed speaking with Haley and Rhodes about the IV, which Harless deemed to represent poor judgment and inappropriate nursing practices. When asked

27

the same question again, later in her deposition, Harless answered that she had informed Becky Rhodes of the IV bolus incident. Harless also stated that she believed that the stress from Bergeron's conflict with Lescord had affected Bergeron's performance. Harless' denial of using the exact phrase relayed in the letter fails to create a genuine factual dispute.

Bergeron's only evidence of pretext comes from her deposition testimony concerning her April 2, 1996, meeting with Bradford. On that date, Haley escorted Bergeron into a conference room where Bradford awaited her. Bergeron described the conversation at that meeting as follows:

> "[Bradford] said, 'We want you to transfer.' And I explained that I had wanted to work in the ER for a very long time. And he said, 'If you don't voluntarily transfer, we're going to find something to terminate you. We can do that.' And I said okay. And he said, 'It's just like a black person getting in trouble and calling it discrimination blaming it on them.' And he said, 'You know, if you have a friend and that friend hurts you, you can overlook it, If that person is not your friend, you won't overlook it.'"

This conversation occurred only days after Bergeron sought to consult an attorney about her concerns and complained to hospital administrators. These alleged statements by the hospital's outside lawyer indicate that hospital personnel were concerned by Bergeron's complaints. These statements may also suggest that Bradford believed Bergeron had falsely claimed sexual harassment merely because she had been having problems at work, even though the hospital had not begun to formally investigate Bergeron's allegations at this point. If believed by a jury, these statements may provide some evidence of pretext.

28

In other circumstances, these alleged statements may have been enough evidence of pretext to create a jury question on the issue of retaliation.  However, such an inference based on this evidence is so greatly overwhelmed by contrary evidence in the record before us, that no reasonable jury could find that the hospital would not have transferred Bergeron but for a motive or desire to *retaliate* against her because she made a complaint, as distinguished from because of, among other things, what was learned from or brought to the fore by the complaint and related investigation.  *See Rhodes,* 75 F.3d at 993 ("Even if the evidence is more than a scintilla, '*Boeing* [*Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (en banc),] assumes that some evidence may exist to support a position which is yet so overwhelmed by contrary proof as to yield to a directed verdict.'") (quoting *Neely v. Delta Brick and Tile Co., Inc.*, 817 F.2d 1224, 1226 (5th Cir.1987)); *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998) ("The plaintiff must reveal a conflict in substantial evidence on the ultimate issue of retaliation in order to withstand a motion for summary judgment. [citation] Evidence is substantial if it is of 'such quality and weight that reasonable and fair minded persons in the exercise of impartial judgment might reach different conclusions.'") (citations omitted).

Even assuming, *arguendo*, that retaliation was a motivating factor in the decision to remove Bergeron from the ER, Bergeron cannot show that the hospital would not have fired her but for

that retaliatory motive.  Bergeron openly admitted that she disliked Lescord, disliked working with Lescord, refused to acknowledge Lescord's orders, and regularly asked other nurses to rearrange their work assignments solely to help Bergeron evade Lescord.  Bergeron frequently broke down in tears at work.  Bergeron did not dispute that her problem with Lescord had lasted over a year and showed no signs of improvement.  Had the hospital actually terminated Bergeron's employment, a jury might have greater cause to question the action or the legitimacy of the hospital's asserted reasons.  But the hospital did not terminate Bergeron.  Instead, the hospital proposed a reasonable solution, narrowly tailored to resolve a serious and ongoing problem.

On these facts, Bergeron cannot show that the hospital would not have transferred her but for a retaliatory motive on account of her complaint.  Perhaps the best indication of this reality comes from Bergeron herself:  her own fears about *losing her job* had prompted Bergeron to file a complaint in the first place.  Not surprisingly, Bergeron has failed to credibly show that she would not have been removed from the ER but for retaliation for complaining of harassment.  Because Bergeron has not presented sufficient evidence from which a reasonable jury could conclude that retaliation for her complaint was a but-for cause of her transfer, we affirm the district court's grant of summary judgment for the hospital.

## Conclusion

Not all workplace harassment between a man and a woman is

sexual harassment.  Bergeron offered no evidence other than sheer speculation that Lescord's treatment toward her was based on sex, and we will not presume such motivation by the mere fact that Lescord is a man and Bergeron is a woman.  The district court properly granted summary judgment to the hospital on the issue of sexual harassment.  Furthermore, while Bergeron may have presented some evidence from which it could be inferred that a retaliatory motive played some slight part in the transfer decision, we conclude that she cannot overcome the evidence clearly showing that the hospital transferred her essentially for other reasons and would have done so for such reasons regardless of any retaliatory motive.  The hospital was entitled to summary judgment on Bergeron's retaliation claim as well.

AFFIRMED

FORTUNATO P. BENAVIDES, Circuit Judge, specially concurring:

   I concur in the judgment and agree with Judge Garwood's factual and legal analysis of Bergeron's sexual harassment claim. With regard to Bergeron's Title VII retaliation claim, I would affirm solely for the reason give by the district court. Under the facts presented to the district court as fully set out in Judge Garwood's thorough opinion, I would find that Bergeron could not have reasonably believed that she had been <u>sexually</u> harassed.